INTERSTATE POWER COMPANY,
Plaintiff,

v.

KANSAS CITY POWER & LIGHT COM-
PANY; and Iowa–Illinois Gas & Elec-
tric Company, Defendants.

KANSAS CITY POWER & LIGHT
COMPANY, Defendant and
Third–Party Plaintiff,

v.

IOWA–ILLINOIS GAS & ELECTRIC
COMPANY, Third–Party
Defendant,

and

Bob McKiness Excavating & Grading,
Inc., Third–Party Defendant and
Fourth–Party Plaintiff,

v.

CITY OF MASON CITY; and Iowa
Department of Natural Resources,
Fourth–Party Defendants.

No. C 89–3033.

United States District Court,
N.D. Iowa,
Central Division.

Sept. 1, 1993.

Kent M. Ragsdale, Dubuque, IA, Clement F. Springer, Jr., Ronald W. Teeple, John L. Leonard, Defrees & Fiske, Chicago, IL, for plaintiff Interstate Power Company, a Delaware Corporation.

Mark L. Zaiger, Shuttleworth & Ingersoll, Cedar Rapids, IA, Jerome T. Wolf, Terry W. Schackmann, Barry L. Pickens, Spencer Fane Britt & Browne, Kansas City, MO, Mark G. English, Kansas City Power & Light, Kansas City, MO, for defendant Kansas City Power and Light Co.

David C. Duncan, Stephen D. Hardy, Iris J. Post, Grefe & Sidney, Des Moines, IA, for third-party plaintiff Bob McKiness Excavating & Grading, Inc.

Thomas J. Shields, Lane Waterman, Davenport, IA, Cathy S. Woollums, Iowa–Illinois Gas & Electric Co., Davenport, IA, Robert M. Olian, Pamela R. Hanebutt, Arlene Haas,

Sidley & Austin, Chicago, IL, for third-party defendant Iowa–Illinois Gas and Elec. Co.

Anne L. Clark, Philip H. Dorff, Jr., Hopkins Huebner, Des Moines, IA, for third-party defendant City of Mason City, Iowa.

Craig A. Kelinson, Asst. Atty. Gen., Des Moines, IA, for third-party defendant Iowa Department of Natural Resources.

## INDEX OF CONTENTS

INTRODUCTION ............................................................. 1246
FINDINGS OF FACT ........................................................ 1247
 Findings of Fact in IPC's Case Against KCPL ................................. 1247
 Findings of Fact in IPC's and KCPL's Case Against Iowa–Illinois ............... 1254
 Control of Peoples By Railways (Maine) and Power ......................... 1254
 Liquidation and Dissolution of Power ..................................... 1256
 Liquidation and Dissolution of Railways (Delaware) ......................... 1257
 KCPL's Acquisition of Peoples' Assets .................................... 1259
 Agency Relationship Between KCPL and Peoples ........................... 1261
 Liquidation of Continental in 1949 ....................................... 1262
CONCLUSIONS OF LAW .................................................... 1262
 General Conclusions of Law .............................................. 1262
 Conclusions of Law Re: IPC's CERCLA Claims Against KCPL ................. 1264
 Contract Language ..................................................... 1265
 Extrinsic Evidence .................................................... 1271
 Conclusions of Law Re: IPC's State Law Claims ........................... 1273
 Conclusions of Law Re: Liability of Iowa–Illinois .......................... 1274
 Iowa–Illinois as Successor to Railways (Delaware) ......................... 1275
 Continuation Theory ............................................... 1276
 Express/Implied Assumption of Liability .............................. 1278
 De Facto Consolidation or Merger ................................... 1278
 Piercing Peoples' Corporate Veil ........................................ 1279
 Traditional Veil Piercing & Owner Liability ........................... 1279
 Control & Operator Liability ......................................... 1280
 KCPL's Status as Corporate Successor or Operator ........................ 1281
CONCLUSION .............................................................. 1281
ORDER .................................................................... 1282
APPENDIX A: Chart of Successorship Theories

---

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

DONALD E. O'BRIEN, Senior District Judge.

#### INTRODUCTION

This cause having come on for trial, the court, having heard and considered the evidence including the testimony of witnesses and the presentation of exhibits, and having heard and considered arguments of counsel, and being otherwise fully advised, now makes and enters herein the following Findings of Fact and Conclusions of Law. To summarize the outcome of the Court's Findings of Fact and Conclusions of Law, the Court has ruled in favor of Interstate Power Company on its CERCLA claims against Kansas City Power & Light Company; ruled in favor of Interstate Power Company on its state law contribution claim (Count VII) against Kansas City Power & Light Company; ruled against Interstate Power Company on all of its other state law claims against Kansas City Power & Light Company; and ruled against Interstate Power Company and Kansas City Power & Light Company on their claims against Iowa–Illinois Gas & Electric Company.

Before setting out its Findings of Fact and Conclusions of Law, the Court draws the readers attention to several abbreviations that are used frequently herein.[1] Readers

---

1. The Court notes the following abbreviations: Interstate Power Company is referred to as IPC. Kansas City Power & Light Company is referred to as KCPL. Iowa–Illinois Gas & Electric Company is referred to as Iowa–Illinois. Peoples Gas & Electric Company is referred to as Peoples (Mason City) or simply Peoples. United Light & Railways Company, a Maine corporation, is re-

may also find it helpful to first examine APPENDIX A, which sets out the theories of corporate succession discussed herein.

## FINDINGS OF FACT

### Findings of Fact in IPC's Case Against KCPL

1. This case involves a parcel of real property located at Delaware Avenue and Fifth Street, S.E., and abutting a waterway known as Willow Creek, in Mason City, Section 10 of Twp. 96 N., Range 20 W., Cerro Gordo County, Iowa (hereinafter referred to as the "Site").

2. From about 1904 to 1952, a coal gasification plant, also referred to as a manufactured gas plant, existed on a portion of the Site. (IPC Exs. 2, 3, 11, 15, 21–27, 63–69, 73, 80–82; KCPL Ex. 50.)

3. From approximately 1904 until 1931, and then intermittently thereafter until 1948 at the latest, People's Gas & Electric (hereinafter "People's (Mason City)") operated the manufactured gas plant at the Site. (IPC Exs. 2, 3, 4, 11, 15, 21–27, 63–69, 73, 80–82.)

4. A by-product of the coal gasification process utilized by that plant was coal tar or water gas tar. (Testimony of Michael Chase, Tr. 44; Scott Harkins, Tr. 14–33; KCPL Ex. 284.)

5. During the operation of the manufactured gas plant at the Site, coal tar was generated and stored at the site. (Testimony of Michael Chase, Tr. 7–10, 21–24.)

6. Constituent hazardous substances derivative from the coal tar generated and stored at the Site have also been found at the Site. (Testimony of Michael Chase, Tr. 8–9, 12; IPC Exs. 225, 447.)

7. From 1901 until October 1, 1906, the corporate owner-operator of the Site was Brice Gas & Electric Company, owned by Mr. W.E. Brice; from October 1, 1906 until April 1, 1913, the corporate owner-operator

of the Site was Peoples Gas & Electric Company (hereinafter referred to as "Peoples"), then owned by Mr. W.E. Brice. (IPC Exs. 1–4.)

8. In 1912 or 1913, Peoples was acquired by United Light & Railways Company, a Maine corporation with its principal offices in Grand Rapids, Michigan (said corporation hereinafter referred to as Railways (Maine)). (IPC Exs. 7, 8, 10.)

9. In 1923 or 1924, United Light & Power Company (Hereinafter referred to as "Power"), a Maryland corporation, was incorporated. (KCPL Ex. 702, Response of Iowa–Illinois to KCPL Request to Admit No. 3.)

10. On October 2, 1924, an article in *The Mason City Daily Globe Gazette,* "Mason City Concern Part of Gigantic Consolidation of Electrical Companies," announced that Peoples, along with other utility companies, would be consolidated with The United Light and Power Company. (IPC Ex. 16.)

11. In 1923, Power acquired all of Railways' (Maine) assets, which included Peoples, and assumed all of its liabilities, and Railways (Maine) was then dissolved. (IPC Ex. 588–B.)

12. In April 1932, Power sold all of Peoples' stock to Power & Light Securities Company, a member of the United Light & Power holding company family, in exchange for $4,393,750. (IPC Exs. 54, 55.)

13. On or about April 4, 1932, KCPL, also a member of the United Light & Power holding company family, agreed with Power & Light Securities Company to purchase the assets of Peoples in exchange for $4,393,750 and the assumption of Peoples' liabilities. (KCPL Ex. 702, Response of Iowa–Illinois to KCPL Requests to Admit Nos. 7–11; IPC Exs. 29–34.)

14. On or about April 11, 1932, KCPL purchased the assets of Peoples for $4,393,-750 and the assumption of Peoples' liabilities.

---

ferred to as Railways (Maine). United Light & Power Company is referred to as Power. United Light & Railways Company, the Delaware corporation, is referred to as Railways (Delaware). The manufactured gas plant that is the subject of this litigation is sometimes referred to as an MGP. The Public Utility Holding Company Act

is sometimes referred to as PUHCA. There may be other abbreviations used in the text and Court has attempted to note abbreviations when used in the text, but the Court thought it may be helpful to the reader to provide this introductory list of abbreviations.

(KCPL Ex. 15; KCPL Ex. 702, Response of Iowa–Illinois to KCPL Requests to Admit Nos. 7–11, 13; IPC Exs. 29–31, 33, 34, 48, 75.)

15. In October of 1932, following KCPL's purchase of Peoples' assets, KCPL became the owner of one hundred percent of Peoples' stock. (IPC Ex. 43(b), 44; KCPL Ex. 1, p. 2; Iowa–Illinois Ex. 7.)

16. After KCPL's purchase of Peoples' assets in April 1932, Peoples continued to operate and manage the Site, and operate the gas manufacturing plant thereon, as KCPL's agent under an agency agreement, for which Peoples was to receive $100.00 per year, and said operation continued under the name of Peoples' Gas & Electric Company. (Iowa–Illinois Ex. 1; IPC Ex. 75.)

17. Following KCPL's purchase of Peoples in April 1932, the manufactured gas plant on the Site was operated on an experimental basis in 1933 producing water gas, some of which was for domestic use, and some water gas was manufactured at the Site in 1941. (IPC Exs. 65, 67.)

18. Peoples, as KCPL's agent, continued to manage the Site from 1932 to 1950 when the agency agreement between Peoples and KCPL was terminated. (IPC Ex. 75.)

19. The $100.00 annual fee due Peoples under its agency agreement of April 1, 1932 with KCPL may not have been paid regularly, and was not paid at all in the later years of the life of the agency agreement. (KCPL Ex. 15, p. 1.)

20. The manufactured gas plant and gas holder at the Site, except for certain underground basins and cisterns that were buried and concealed from sight, were removed in 1952 to provide for power plant use. (Testimony of Michael Chase; IPC Ex. 11, p. 27.)

21. During or following the removal of the manufactured gas plant at the Site, coal tar was left in underground storage or retention basins or cisterns; these basins or cisterns were filled and covered with dirt and debris from the old plant, and then covered over with dirt and some gravel, and these underground structures were not visible from the surface. (Testimony of Michael Chase, Tr. 27–28.)

22. In 1956, KCPL decided to sell the properties because the Iowa location was too remote and therefore difficult to manage for KCPL, an electric utility located in and around the Kansas City area, and because KCPL needed additional funds for expansion of electric generation capacity to serve KCPL's primary service territories. (Testimony of A.J. Doyle, Tr. 84–87.)

23. In the sale, KCPL intended to sell its entire Iowa properties on operations, including all properties, whether real or personal, tangible or intangible, and all rights, interests, easements, and franchises in Iowa, and to withdraw from the state. (Testimony of A.J. Doyle, Tr. 94–94, 107.)

24. On January 4, 1957, KCPL officially solicited bids on the Mason City property. (KCPL Ex. 60, at 13–14.)

25. Numerous utilities in Iowa and Illinois submitted bids to purchase the Iowa properties, which represented an on-going utility property serving Mason City and surrounding areas with electric generation and transmission and gas distribution services. (IPC Ex. 83, Testimony of A.J. Doyle, Tr. 91.)

26. Before submitting its bid, IPC personnel and representatives from Middle West Services Company visited the Iowa properties and spoke with KCPL personnel about the properties. (KCPL Ex. 60 at 547–50; Testimony of A.J. Doyle, Michael Chase, Ken Kalahar.)

27. IPC's Director of Production, Larry McNeil, who had responsibility for IPC's own prior MGP operations, visited the Iowa properties and interviewed KCPL personnel. (Testimony of Ken Kalahar, Tr. 5–6; Earl Forslund, Tr. 55–56.)

28. KCPL personnel did not intentionally conceal any facts regarding the Mason City site at issue in this litigation as the prior MGP operations were not a topic of discussion. (Testimony of Ken Kalahar, Tr. 9–10.)

29. In 1956, prior to the official bidding and sales process, KCPL delivered to IPC, which was interested in acquiring KCPL's utility business in northern Iowa, a report prepared by Ebasco Services Incorporated

(hereinafter referred to as the "Ebasco Report"), which report described the property and business in Iowa which KCPL desired to sell. (IPC Ex. 11.)

30. At page 27, the Ebasco Report, as part of the section entitled "Electric Department Property," states that "[i]n 1951–1952 the adjoining [to a steam-electric station] manufactured gas plant and holder were removed, releasing the space for power station use." (IPC Ex. 11.)

31. The above-quoted reference at page 27 of the Ebasco Report is the only reference or mention in that report to a manufactured gas plant which had at one time existed on the Site. (IPC Ex. 11.)

32. At page 29 of the Ebasco Report, the section entitled "Gas Department Property" only mentions the peak shaving (propane) gas plant, and makes no mention of the manufactured gas plant which had at one time existed on the Site. (IPC Ex. 11.)

33. Michael Chase, IPC's Vice–President, testified at trial that he understood the following language of the Ebasco Report, "[i]n 1951–1952 the adjoining manufactured gas plant and holder were removed, releasing the space for power station use," to mean that the entire plant had been removed, including any sub-surface coal tar storage basins or cisterns. (Testimony of Michael Chase, Tr. passim.)

34. Scott Harkins, KCPL's expert witness, testified at trial that sub-surface coal tar storage basins or cisterns were part of a manufactured gas plant and were not considered to be separate structures. (Testimony of Scott Harkins, Tr. 30–60.)

35. On February 11, 1957, IPC and KCPL entered into a contract (hereinafter referred to as the "Agreement") by the terms of which KCPL agreed to sell and IPC agreed to purchase certain property in and around Mason City, Iowa. (IPC Ex. 86.)

36. The 1957 contract contained a base price determined by reference to the Iowa utility's assets and liabilities as of September 1956, with adjustments to that price for current and accrued assets and liabilities to be effective as of 5:00 p.m. on the closing date,

May 29, 1957, all as more fully set out in the contract. (IPC Ex. 86.)

37. The contract provided that the parties would, within 90 days from the date of closing, meet again to make a final determination of the base price adjustments. This was necessary because the Iowa properties constituted an on-going utility business, with constantly accruing assets, such as accounts receivable from continuing electric and gas deliveries to customers, as well as constantly accruing liabilities associated with natural gas deliveries from an interstate natural gas pipeline. (IPC Ex. 86; Testimony of A.J. Doyle, Tr. 95–98.)

38. The property which was the subject of the Agreement consisted of a public utility business, known as the Peoples' Division of KCPL, and consisted of utility plants, land, and related personal property. (IPC Ex. 11; KCPL Ex. 60, pp. 590–595 (May 29, 1957 Bill of Sale).)

39. The property which was the subject of the Agreement was specifically referred to in the Agreement as the "Iowa Properties." (IPC Ex. 86.)

40. The Iowa Properties were described at page 1, paragraph 1, of the Agreement as consisting of specific property "all of which is more fully described in a report prepared by Ebasco Services Incorporated dated October 1956, as subsequently revised." (IPC Ex. 86.)

41. At page 13, paragraph 8(c), the Agreement states that, "[t]he Buyer [IPC] covenants and agrees with the Seller [KCPL] that the Buyer will take possession and control of the Iowa Properties at 5:00 p.m., Central Standard Time, on the Closing Date and that from and after such time the Buyer will assume and will indemnify the Seller against all liabilities and obligations of every kind and character whatsoever arising subsequent to the Closing Date as pertain to the business and operations of the Iowa Properties, including obligations and liabilities arising subsequent to the Closing Date on account of contracts and other commitments made by the Seller in the ordinary course of business prior to the Closing Date, except any liability arising out of certain litigation

now pending in the United States Court of Appeals for the Eighth Circuit, entitled *First Iowa Hydro Electric Cooperation, et al. v. Iowa–Illinois Gas and Electric Company, et al.,* Civil Nos. 15548 and 15549." (IPC Ex. 86.)

42. Pursuant to the Agreement, on May 29, 1957, IPC purchased the Iowa Properties from KCPL. (IPC Ex. 60.)

43. As part of the closing documents relating to the May 29, 1957 purchase of the Iowa Properties, IPC and KCPL executed a General Bill of Sale, dated May 29, 1957. (KCPL Ex. 60, pp. 590–595.)

44. The General Bill of Sale describes the Iowa Properties as consisting of specific property "as the same exists as of the date hereof [May 29, 1957]." (KCPL Ex. 60, pp. 590–595.)

45. The General Bill of Sale also contains an indemnity provision, which provides as follows:

PROVIDED, THAT the Buyer shall, and by its acceptance hereof does, assume and indemnify the Seller against all of the Seller's liabilities and obligations of every kind and character whatsoever arising subsequent to the date hereof as pertain to the business and operations of the Iowa Properties, including obligations and liabilities arising subsequent to the date hereof on account of contracts and other commitments made by the Seller in the ordinary course of business prior to the date hereof, and, in particular, the Seller's liabilities for gas and electricity purchased and unbilled prior to the date hereof, and all other current and accrued liabilities of the Seller as of the date hereof, including deferred credits to the extent they constitute liabilities and refundable contributions in aid of construction, all as related to the Iowa Properties and for which a credit adjustment to the purchase price hereof has been made by the Seller; and the Buyer shall, and by acceptance hereof does, assume the Seller's obligations under its collective bargaining agreement dated October 17, 1956, with Local Union No. 432 of the International Brotherhood of Electrical Workers, the Retirement Annuity Plan underwritten by The Equitable Life Insurance Society of

the United States and contract dated July 28, 1939, as amended, the Group Life Insurance Plan with The Travelers Insurance Company, Hartford, Connecticut, dated February 5, 1954, and effective January 1, 1954, as amended, and the Health and Accident Benefit Plan with Hospital Service, Inc. of Iowa under an enrolling agreement dated December 12, 1952.

(KCPL Ex. 60, pp. 590–595.)

46. As previously mentioned, the Agreement provides that the base price for the sale of the Iowa Properties shall be adjusted to reflect, among other things, current and accrued liabilities of the Seller. (IPC Ex. 86, ¶ 4(a)(iv), p. 6.)

47. Current and accrued liabilities, as the term is used in the Agreement, are itemized and quantified in Exhibit A attached to the Agreement. (IPC Ex. 86, Ex. A.)

48. Exhibit A attached to the Agreement, and specifically the listing of current and accrued liabilities appearing thereon, makes no mention of a manufactured gas plant, coal tar or water gas tar, or of any liabilities arising from the manufactured gas plant or from any of the waste material produced by that plant. (IPC Ex. 86.)

49. In the Bill of Sale, the term "current and accrued liabilities" appears in the indemnity clause set forth therein. (KCPL Ex. 60, pp. 590–595.)

50. The Bill of Sale makes no mention of a manufactured coal gas plant, coal tar or water gas tar, or of any liabilities arising from the manufactured coal gas plant or from any of the waste material produced by that plant; and no evidence was presented that KCPL ever named or listed the manufactured coal gas plant, coal tar or water gas tar, or of any liabilities arising from the manufactured coal gas plant or from any of the waste material produced by that plant, as "current and accrued liabilities." (KCPL Ex. 60, pp. 590–595.)

51. The Bill of Sale of May 29, 1957, at page 3, under its description of the "gas production facilities of the Seller [KCPL]," mentions only a "peak shaving [propane] gas

plant ... located near the west city limits of Mason City." (KCPL Ex. 60, p. 592.)

52. Unlike the 1957 IPC/KCPL transaction, when the assets of Peoples were sold to KCPL in 1932, the parties executed a Deed and Bill of Sale dated April 9, 1932 which specifically identified the manufactured gas plant, gas holders, and other appurtenances connected with the gas plant. (IPC Ex. 48, pp. 5, 6.)

53. The parties to the 1957 transaction did not specifically identify the manufactured gas plant, gas holders, and other appurtenances connected with the gas plant among the property to be conveyed because the plant and gas holders had been removed approximately five years prior to closing and were not a part of the Iowa Properties. (Testimony of Michael Chase; IPC Ex. 11, p. 27; IPC Ex. 86; KCPL Ex. 60, pp. 590–595.)

54. One of the closing documents included in KCPL Exhibit 60, at pages 313–315, is an "Index—List of Properties and Major Contracts Prepared For Use in Connection With The Sale Of PEOPLES' GAS & ELECTRIC—A Division of Kansas City Power & Light—Mason City, Iowa To INTERSTATE POWER COMPANY."

55. The above Index of properties (KCPL Ex. 60, pp. 313–315), describes the various utility plants being conveyed by KCPL to IPC, and nowhere mentions a manufactured gas plant or gas holder(s) located at the Site.

56. The only gas plant mentioned in the above Index of properties being conveyed by KCPL to IPC (KCPL Ex. 60, p. 315) is a "Propane–Air Peak Shaving Gas Plant ... located west of Mason City on highway between US Hwy 18 and Ia. Hwy 106."

57. The above Index of properties (KCPL Ex. 60, pp. 330, et seq.), describes the various real properties being conveyed by KCPL to IPC, and in its description of the land at issue in this case, Item No. 9 on page 330 of KCPL Exhibit 60, nowhere mentions a manufactured gas plant or former manufactured gas plant located or previously located at the Site.

58. By contrast, the above Index of properties (KCPL Ex. 60, p. 332) does mention the existence of the propane plant in its description of the parcel of land (Item 21) on which such propane plant was located.

59. In a Certificate dated May 29, 1957, being part of the closing documents, KCPL, by its president and treasurer, stated that "the Iowa properties are free from litigation, claims or proceedings having a material adverse effect on the operation of said properties except as specifically disclosed to Interstate in writing prior to February 11, 1957." (KCPL Ex. 60, p. 858.)

60. When IPC bought the Site in 1957, a portion of the Site where some if not all of the basins or cisterns were located underground was being used as a parking lot and the rest of the Site, as described by the plat contained in KCPL Exhibit 359, was vacant except for a remnant of a gas holder base which was being used as a retaining wall for an oil storage tank. (Testimony of Michael Chase, Tr. 26–28.)

61. On May 29, 1957, as part of the closing, KCPL assigned numerous franchises and easements to IPC, one of which, an Assignment of Franchise of Mason City gas operations (KCPL Ex. 60, pp. 634–635; IPC Ex. 140(b)) mentions the "manufacture, distribution, and vending of gas."

62. As with many of the Assignments of franchises and easements signed by the parties pursuant to closing (IPC Exs. 139–149), the Assignment of Franchise of Mason City gas operations (KCPL Ex. 60, pp. 634–635; IPC Ex. 140(b)) contains an indemnity provision by the terms of which IPC assumed all liabilities and obligations arising subsequent to the date thereof as pertain to said Franchise and Ordinance, and IPC agreed to indemnify KCPL against all such liabilities and obligations.

63. Neither the above Assignment of Franchise nor the indemnity provision contained therein specifically refer to the operations of the manufactured gas plant at the Site.

64. The original Franchise which was the subject of the above Assignment of Franchise originated in 1939, long after natural gas had come to Mason City, and long after the manufactured gas plant at the Site had

ceased producing for commercial reasons gas manufactured from coal.

65. The only "manufactured gas plant" in existence at or near Mason City in 1957 at the time of the execution of the above Assignment of Franchise was the peak shaving (propane) plant located near the west side of Mason City.

66. The Ordinance which was the subject of the above Assignment of Franchise, Ordinance No. 319 pertaining to gas in Mason City, expired in 1963, over twenty years prior to the discovery of the coal tar on the Site and over twenty years prior to the first EPA Consent Order. (KCPL Ex. 60, p. 339.)

67. No evidence has been presented which indicates that KCPL ever advised or notified IPC, prior to either IPC's execution of the February 11, 1957 Agreement or the closing date of the sale of the Iowa Properties, that large quantities of coal tar were located underground at the Site.

68. In a handwritten memo authorized by B.F. Pickard, Chairman of the Board of KCPL, and presumably referring to conversations or communications with Mr. Kapp and Mr. Strickland of I.P.C., and others, on February 13, 1957, Mr. Pickard noted as follows: "KCPL representations and warranties to be true as of closing date—free from service, management, etc. contracts—free from litigation, claims, etc. except as disclosed in writing." (KCPL Ex. 49, p. 3.)

69. On May 14, 1957, Clement F. Springer, attorney for IPC, sent a letter to C.A. Hummel, executive vice president of IPC, enclosing a copy of the property plats of all Mason City real estate to be conveyed at closing, as furnished to Mr. Springer in a copy of Robert Olson's letter to M.L. Kapp, IPC's president, dated May 9. (KCPL Ex. 50.)

70. One of the plats referred to in Mr. Springer's May 14, 1957 letter (KCPL Ex. 50), Drawing CG–10, depicts at least a portion of the Site at issue in this litigation, and describes the same as "Former Site of Gas Plant." That plat does not, however, show the location of the plant, does not indicate the existence of any underground structures including basins or cisterns, does not identify the plant as a coal gasification plant, and does not show any gas holders existing at the Site; rather, it shows several oil tanks, a pump house, tower, and storehouse.

71. There is no evidence which indicates that IPC or its attorneys ever had possession of the above plat (KCPL Ex. 50, Drawing CG–10) prior to May 9, 1957, or prior to the February 11, 1957 Agreement.

72. On May 29, 1957, IPC took possession of the Iowa properties to "commence rendering to the public the same utility service theretofore rendered by KCPL." (KCPL Ex. 60, at 557–58, 922–23.)

73. On May 29, 1957, Robert Olson, an officer of KCPL, wrote a letter to M.L. Kapp, president of IPC, referring to rate refunds which were expected to be received by KCPL from Northern Natural Gas Pipeline Co. for payments KCPL had made to Northern prior to closing, as to which refunds KCPL would be entitled to receive and retain. This letter also provides that as to any refunds which IPC might be required to pay to customers of Peoples because of possible overcharges relating to amounts refunded to KCPL from Northern, KCPL will reimburse IPC for those refunds. (IPC Ex. 95.)

74. On June 17, 1957, L.G. Hawkins, an employee of IPC, wrote a letter to R.O. Linville, controller of KCPL, responding to Mr. Linville's request to IPC to provide KCPL with information concerning any damage claims against KCPL as to which there might be liability; and specifically describing, among others, a claim relating to a storm sewer explosion which occurred on November 23, 1956, prior to closing and prior to the February 11, 1957 Agreement. (IPC Ex. 99.)

75. On June 11, 1957, R.O. Linville, controller of KCPL, wrote what appears to be an in-house memo to C.E. Steele, copies to R.A. Olson and others, discussing bookkeeping problems created by the sale of the Iowa Properties to IPC. In that memo, Mr. Linville stated that "[t]here are certain claims still outstanding which ultimately should be settled by Kansas City Power & Light Company ...". (IPC Ex. 96.)

76. On August 2, 1957, R.O. Linville, controller of KCPL, wrote a letter to IPC, copy to Arthur J. Doyle, discussing the possibility that certain pre-closing use tax liability may have arisen with respect to the construction of the peak shaving plant, and stating that this liability, if it develops, will be paid by KCPL. (IPC Ex. 109.)

77. On November 29, 1957, Charles Strickland, a former officer of KCPL and now an employee of IPC, wrote a letter to Robert Olson, an officer of KCPL, referring to the November 23, 1956 incident (presumably the explosion) and enclosing a check from KCPL to Travelers Insurance Company in the amount of $202.00 to reimburse Travelers for payments made on behalf of the injured party. (IPC Ex. 121.)

78. On September 5, 1957, Robert Olson, an officer of KCPL, wrote a letter to C.W. Edmunds, assistant treasurer of IPC, referring to certain unsettled claims which were the subject of pending lawsuits, and two other incidents involving explosions, and suggesting that KCPL would remain liable for these asserted and unasserted claims. (IPC Ex. 119.)

79. On August 5, 1957, Michael Seltzer, an employee of KCPL, wrote a letter to E.F. Heckinger of the Iowa Income Tax Division, with copies to Olson and Linville, stating that while KCPL will receive no further revenue from the Iowa properties sold, it would continue to have expense with respect to a number of pending lawsuits. (IPC Ex. 110.)

80. On June 17, 1957, Robert A. Olson, an officer of KCPL, wrote a letter to Richard W. Turner of Mendes & Mount of New York, discussing an explosion and fire which occurred on April 4, 1956, at or in relation to KCPL's utility property at Clear Lake, Iowa, which was part of the Iowa Properties conveyed to IPC in May of 1957. (IPC Ex. 101.)

81. In his letter of June 17, 1957, to Richard Turner of Mendes & Mount, Robert Olson stated that, with respect to the Iowa Properties, "[o]ur Company [KCPL] remains liable for unsettled claims for damages." (IPC Ex. 101.)

82. In June of 1984, pursuant to easement rights granted by IPC to the City of Mason City, the City of Mason City was engaged in the excavation of a sewer line on the Site. (Testimony of Michael Chase, Tr. 8.)

83. In June of 1984, during the City's excavation of the sewer line on the Site, coal tar was discovered in the old basins or cisterns located underground at the Site, and coal tar was also discovered in areas adjacent to those basins or cisterns. (Testimony of Michael Chase, Tr. 8–11.)

84. The Iowa Department of Natural Resources, and later the United States Environmental Protection Agency (hereinafter referred to as the "EPA"), were notified of the existence of coal tar on the Site. (Testimony of Michael Chase, Tr. 12.)

85. Following the discovery of the coal tar on the Site, IPC, under the direction and approval of the Iowa Department of Natural Resources, first pumped out some of the coal tar, and then excavated and removed more of it, and deposited the excavated coal tar in a waste pile on the site. (Testimony of Michael Chase, Tr. 9–26.)

86. The quantity of coal tar pumped out, excavated, and removed by IPC from beneath the ground at the Site is estimated at between 1,000 and 1,500 gallons. (Testimony of Michael Chase, Tr. __.)

87. No evidence was presented that prior to June 1984, IPC had actual knowledge of the existence of the coal tar which was discovered in June 1984 to have been present on the Site. (Testimony of Michael Chase, Tr. 28.)

88. No evidence was presented that prior to June 1984, former KCPL employees ever advised IPC officers or management personnel that the coal tar which was discovered in June 1984 had been present on the Site.

89. In 1985, the EPA became involved in the investigation and planned remediation of the contamination at the Site. (Testimony of Michael Chase, Tr. 12–26.)

90. In 1986, IPC entered into a Consent Order with the EPA by the terms of which IPC was to continue investigating the Site with a view toward ultimate remediation of

the contamination at the Site. (IPC Ex. 225.)

91. Most of the investigative and pre-remediation work done by IPC at the Site pursuant to the 1986 Consent Order with the EPA was done by IPC's consultant Eugene A. Hickok and Associates which later merged into J.M. Montgomery & Associates. (Testimony of Michael Chase, Tr. 15–17.)

92. On October 1, 1991, a second Consent Order was executed by IPC and EPA, which Order mandates the continuing investigation and eventual remediation of the contamination at the Site. (IPC Ex. 447.)

93. Both the 1986 and 1991 Consent Orders find that hazardous substances as defined by CERCLA, including polynuclear aromatic hydrocarbons ("PAHs") and related substances, cyanides, phenols, and light aromatic compounds (benzene, toluene, etc.), have been detected at the Site. (IPC Exs. 225, 447.)

94. Both the 1986 and 1991 Consent Orders further find that the soil and groundwater at the Site are contaminated with PAHs, volatile organic compounds, and cyanides, that the waste pile on the Site also contains these contaminants, and that the sediment of Willow Creek is contaminated with PAHs. (IPC Exs. 225, 447.)

95. Both the 1986 and 1991 Consent Orders further find that some or all of the hazardous substances present at the Site are actually or potentially carcinogenic, toxic to man and animals, soluble in water, volatile in the environment, and potentially absorbable in the soil. (IPC Exs. 225, 447.)

96. The Research Triangle Institute publication, "U.S. Production of Manufactured Gases—Assessment of Past Disposal Practices," (KCPL Ex. 284), was prepared for use by the EPA, and was prepared under the supervision of KCPL expert witness Scott Harkins.

97. At pages 154 and 155 of the Triangle Report (KCPL Ex. 284), the Report cites from a number of publications and studies dating from the late 1890s to the early 1920s, which describe how even in the early decades of this century manufactured gas plant tar wastes were considered to give rise to possible nuisance conditions, pollution of soil and water, and other environmental problems.

98. On March 27, 1989, IPC sent a CERCLA Notice of Claim letter to KCPL formally notifying KCPL of the contamination condition at the Site and of the existence of the June 3, 1986 EPA Consent Order, and demanding that KCPL reimburse IPC for its costs in connection with the contamination at the Site. (IPC Ex. 362.)

99. On May 21, 1989, this lawsuit was filed by IPC against KCPL, and was amended in 1990 to include IPC's action against Iowa–Illinois.

100. As of February 1, 1992, IPC had expended approximately 1.42 million dollars with respect to the contamination condition at the Site, of which approximately $500,000 was for attorneys' fees and costs. (Testimony of Michael Chase.)

101. Of the approximately $890,000 expended by IPC with respect to this Site, which is the approximate total of IPC's expenses less attorneys' fees and costs, approximately $271,000 was paid by IPC to EPA as reimbursement for EPA's expenses incurred in investigating the Site. (Testimony of Michael Chase, Tr. 15.)

### Findings of Fact in IPC's and KCPL's Case Against Iowa–Illinois

*Control of Peoples by Railways (Maine) and Power*

102. The court repeats and incorporates by reference herein Findings of Fact in IPC's case against KCPL Nos. 1 through 11.

103. On April 1, 1913, Peoples entered into a written contract with Railways (Maine) by the terms of which Railways (Maine) was appointed General Manager of Peoples' electric, gas and central heating plants in Mason City, and Railways (Maine), among other things, agreed: (1) "[t]o faithfully and diligently supervise, control, manage and finance the operations of [Peoples] and to give whatever time, attention, skill, energy, knowledge and ability during the life of [the] agreement that may be necessary for the proper carrying on, management, operation, extension, construction and financing of said properties

and to promote in every way possible the welfare of [Peoples] and its properties;" (2) "[t]o superintend, and direct the keeping of all books and accounts of the Company [Peoples];" (3) "[t]o request, allow and permit such of its (Railways (Maine)) officers and employees to act as officers and directors of [Peoples]," without payment of salary by Peoples; (4) "[t]o employ local managers and other employees for [Peoples] ... and to use its own discretion in the hiring or discharging of such local managers and employees." By the terms of such agreement, Railways (Maine) was to "have the entire supervision, control and management of all of the properties and books of [Peoples] ...". (IPC Ex. 13.)

104. The April 1, 1913 Agreement between Peoples and Railways (Maine) was for a term of five years, and thereafter was to continue in effect on a year-to-year basis, subject to agreed cancellation provisions. (IPC Ex. 13.)

105. On October 8, 1917, Peoples and Railways (Maine) entered into another written management contract by the terms of which Railways (Maine) was appointed General Manager of Peoples, with full authority to "supervise, manage, and operate" Peoples. (IPC Ex. 13.)

106. The October 8, 1917 agreement between Peoples and Railways (Maine) contained similar language to that contained in the April 1, 1913 contract, and was for a term of five years, with an optional renewal term of an additional five years, subject to agreed cancellation provisions. (IPC Ex. 13.)

107. On January 1, 1919, Peoples and Railways (Maine) entered into another written management contract by the terms of which Railways (Maine) agreed to "supervise and manage all of the properties of [Peoples]". (IPC Ex. 13.)

108. The January 1, 1919 agreement between Peoples and Railways (Maine) contained similar language to that contained in the April 1, 1913 and October 8, 1917 contracts and was for a term of one year, renewable year-to-year, subject to agreed cancellation provisions. (IPC Ex. 13.)

109. On January 1, 1921, Peoples and Railways (Maine) entered into another written contract by the terms of which Railways (Maine) was appointed Contractor, with full authority to "do all necessary construction work in connection with the extensions, improvements or betterments of [Peoples'] property." (IPC Ex. 13.)

110. On November 11, 1925, Peoples and Power entered into a written Agreement, "Providing for the Subjection of the Property of Peoples Gas and Electric Company to the Mortgages of the United Light and Power Company" (hereinafter referred to as the "Subjection Agreement"). (IPC Ex. 20.)

111. The Subjection Agreement states that as of November 11, 1925, all but fifteen shares of Peoples' capital stock was owned by Power, and that Railways was the predecessor company of Power. (IPC Ex. 20.)

112. The Subjection Agreement further states as follows:

> The United Company [Power] from time to time in the past has supplied money required by the Peoples Company [Peoples] in order to make betterments, improvements and extensions of and additions to its properties and to render adequate public service, and the Peoples Company will require additional money for such purposes and is and will be unable to obtain on its own credit sufficient money therefor. The United Company is willing to supply to the Peoples Company the money required for such purposes, as needed, through the use of the credit of the United Company and the sale of its bonds issued under said First Lien and consolidated Mortgage, and the Peoples Company desires that money for the purposes mentioned above shall be supplied to it through the use of the credit of the United Company and through the sale of such bonds.

(IPC Ex. 20.)

113. On January 1, 1924, Peoples and United Light and Power Engineering & Construction Company, a Maryland corporation having its principal places of business in Grand Rapids, Michigan, and Davenport, Iowa, entered into three written contracts by the terms of which United Light and Power

Engineering & Construction Company was appointed Contractor, with full authority to "do all necessary construction work in connection with the extensions, improvements or betterments of [Peoples'] property" (IPC Ex. 19); was appointed Engineer, with full authority to perform all engineering work "in connection with the extensions, improvements or betterments of [Peoples'] property" (IPC Ex. 19); was appointed Manager of Peoples' property, with full authority to "supervise and manage all of the properties of [Peoples]". (IPC Ex. 19.)

114. On September 1, 1931, Peoples and United Light and Power Engineering & Construction Company, a Maryland corporation, entered into a written Supplemental Agreement which affirmed the management contract of January 1, 1924 between Peoples and United Light and Power Engineering & Construction Company, but modified the management fee arrangement between the parties. (IPC Ex. 19.)

115. United Light & Power Engineering & Construction Company was a subsidiary of Railways (Maine) and later a subsidiary of Power. (IPC Exs. 588–A, 588–C.)

116. At least by the year 1932, Power had become the owner of all of Peoples' stock. (KCPL Ex. 702, Response of Iowa–Illinois to KCPL Request to Admit No. 3.)

*Liquidation and Dissolution of Power*

117. Iowa–Illinois was first incorporated in 1940, as a Peoples' Light and Power Company, a company unrelated to Peoples' (Mason City). In 1941, Peoples' Light and Power Company's name was changed to Iowa–Illinois Gas and Electric Company. (IPC Exs. 544, 546.)

118. On or about March 20, 1941, the Securities and Exchange Commission ("SEC") ordered the liquidation and dissolution of Power pursuant to Section 11 of the Public Utility Holding Company Act of 1935. (KCPL Ex. 702, Response of Iowa–Illinois to KCPL Request to Admit No. 28.)

119. Pursuant to the liquidation process required by the above-mentioned order of the SEC, Power sold the assets of nine of its subsidiaries to Iowa–Illinois. Peoples was not among the nine subsidiaries sold to Iowa–Illinois. (KCPL Ex. 702, Response of Iowa–Illinois to KCPL Request to Admit No. 29.)

120. The securities and indebtedness of the following companies were transferred to Iowa–Illinois: Cedar Rapids Gas Co., Fort Dodge Gas & Electric Co., Iowa City Light & Power Company, Ottumwa Gas Company, Peoples' Light Co., Peoples' Power Co., Tri–City Railway Co. (Illinois), Tri–City Railway Co. (Iowa), Moline–Rock Island Manufacturing Co. (KCPL Ex. 702, p. 16, ¶ 29.5.)

121. These utilities commonly were called the "First Lien Companies." because their assets and securities provided security for the First Lien and Consolidated Mortgage Bonds (the "first lien"), originally issued by Railways (Maine). (KCPL Ex. 702, p. 17, ¶ 29.c.)

122. Although the first lien initially was created by Railways (Maine), *see* KCPL Ex. 702, p. 17, ¶ 29.c, by 1941, Power had succeeded Railways (Maine) as the obligor on the first lien. (IPC Ex. 576, p. 6.)

123. Peoples' securities and assets had secured the same obligations until KCPL acquired Peoples' assets. (KCPL Ex. 702, p. 17, ¶ 29.d.)

124. Power's wholly-owned subsidiary Railways (Delaware) gave Iowa–Illinois $13,375,000 in exchange for shares of Iowa–Illinois stock. (IPC Ex. 575, p. 6; KCPL Ex. 12.)

125. Iowa–Illinois gave Power the $13,375,000 from Railways (Delaware) and assumed the $16,000,000 outstanding amount of Power's first lien and consolidated mortgage in exchange for all the stock of the nine operating subsidiaries. (IPC Ex. 575, p. 6; KCPL Ex. 12.)

126. Power transferred to Railways (Delaware), as a contribution to paid-in surplus, miscellaneous investments of $1.7 million, including the preferred stock and debentures of Railways (Delaware) and Continental, and all outstanding capital stock of another subsidiary, the United Light & Power Service Company (the "Service Company"). (KCPL Ex. 702, p. 17, ¶ 29.e; IPC Ex. 573, p. 13, 14; KCPL Ex. 12.)

127. Pursuant to the liquidation process required by the above-mentioned order of the SEC, and pursuant to a plan of liquidation approved by the United States District Court in Delaware, in about the mid–1940s Power was dissolved and its stock was exchanged for that of United Light and Railways Company, a Delaware corporation (hereinafter referred to as "Railways (Delaware)"), and Railways (Delaware) assumed the same position previously held by Power as the apex of the pyramid of the holding company system. (KCPL Ex. 702, Response of Iowa–Illinois to KCPL Request to Admit No. 29(g); IPC Exs. 587, 588, 588–D.)

128. Power thus held the common stock of Railways (Delaware) as its sole remaining asset. (IPC Ex. 573, p. 13, 14; KCPL Ex. 12.)

129. Railways (Delaware) assumed all of Power's unpaid liabilities. (IPC Ex. 536, p. 2, ¶ 2.)

130. Power's President and Secretary were the President and Secretary of Railways (Delaware) at the time of the dissolution. (IPC Ex. 573; p. 18.)

131. There is no evidence that these individuals did not remain officers of Railways (Delaware) after the dissolution.

*Liquidation and Dissolution of Railways (Delaware)*

132. On or after May 24, 1949, Railways (Delaware) submitted to the SEC a plan for the liquidation of Railways (Delaware). (KCPL Ex. 702, Response of Iowa–Illinois to KCPL Request to Admit No. 31.)

133. The Plan for the liquidation of Railways (Delaware) first called for the recapitalization of Iowa–Illinois· by capitalizing surplus and issuing ten shares of stock for each share then outstanding. (KCPL Ex. 702, p. 21, ¶ 34.)

134. After the recapitalization, Iowa–Illinois had 1,904,003 shares of common stock outstanding. (IPC Ex. 578, p. 11, ¶ 10.)

135. Railways (Delaware) thereafter contributed $5,000,000 to KCPL in exchange for which KCPL issued to Railways (Delaware) additional shares of its common stock. (*Id.*, p. 10, ¶ 12.)

136. Railways (Delaware) then sold its shareholders pro rata rights to purchase the KCPL stock. (*Id.*, p. 10, ¶ 13.)

137. All cash received upon the sale of the rights and the KCPL stock was applied first to the Continental bank loan. (*Id.*) Any excess was to be applied to the other indebtedness of Railways (Delaware). (*Id.*, p. 13, ¶¶ 11–12; IPC Ex. 583, pp. 8–9, 27, ¶ 15.)

138. Pursuant to the Plan of Liquidation of Railways (Delaware), Railways (Delaware) stock was exchanged for Iowa–Illinois stock, KCPL stock, St. Joseph Power & Light Stock, Iowa Power & Light stock, and Eastern Kansas Utilities, Inc. stock, and shareholders of Railways (Delaware) thus became shareholders of the five operating companies. (KCPL Ex. 702, Response to Iowa–Illinois to KCPL Request to Admit No. 41.)

139. All of Railways' (Delaware) capital stock "was surrendered and cancelled pursuant to the Plan." (KCPL Ex. 31, p. 2.)

140. Over 99 percent of Iowa–Illinois' stock was distributed to Railways' (Delaware) shareholders; the remainder was unclaimed, and was sold. (IPC Ex. 549, p. 3.)

141. Pursuant to the Plan of Liquidation of Railways (Delaware), Iowa–Illinois was to be the last subsidiary distributed from Railways (Delaware), and pursuant to such plan all of Railways' (Delaware) cash remaining after payment of or provision for Railways' (Delaware) debts, liabilities, expenses and distributions to its shareholders was to be contributed as paid-in surplus to Iowa–Illinois when it was determined by the board of directors that it was appropriate to do so. (KCPL Ex. 702, Response of Iowa–Illinois to KCPL Request to Admit No. 42.)

142. As shown on Exhibit D–6 to Railways' (Delaware) "First Amendment to Application for Approval of Plan Providing for the Liquidation of [Railways (Delaware)]," the estimated dividends from Iowa–Illinois for 1949 and the first half of 1950 would account for more than 50% of the total estimated income of the Railways (Delaware) holding company for that period. Exhibit D–6 also states: "This estimate of earnings is

predicated upon various assumptions and estimates and should not be construed as a representation of future earnings." No evidence was introduced indicating whether or not these projected earnings were ever realized. (IPC Ex. 570.)

143. The Plan allowed Iowa–Illinois to assume Railways' (Delaware) liabilities as a means of providing payment, at least to the extent of the cash contributions from Railways (Delaware):

> Provision may be made for the payment of debts, and liabilities, and expenses of [Railways (Delaware)], Continental and the Service Company by the assumption thereof by Iowa–Illinois, provided that, without the express approval of the [SEC], the amount of debts, liabilities and expenses assumed by Iowa–Illinois pursuant to this paragraph shall not exceed the amount of cash contributed to such company.

(KCPL Ex. 702, p. 26, ¶ 43; IPC Ex. 578, ¶ 18; IPC Ex. 523.)

144. At the conclusion of the dissolution, Railways' accumulated cash, amounting to approximately $1.765 million, was contributed to Iowa–Illinois. (KCPL Ex. 38, p. 2.)

145. In a letter dated March 23, 1953, Iowa–Illinois confirmed its intention to assume Railways' (Delaware) liabilities:

> Iowa–Illinois will assume the debts, liabilities and expenses of United Light & Railways up to the amount realized from the assets . . . .

(IPC Exs. 523, 536.)

146. In its Order dated December 3, 1951, the SEC confirmed that Iowa–Illinois' assumption of Railways' (Delaware) liabilities would occur:

> Railways [Delaware] will, in the near future, transfer to [Iowa–Illinois] the last major subsidiary divested, all of its remaining assets consisting for the most part of cash; and to the extent of the cash so transferred, *[Iowa–Illinois] will assume the debts, liabilities and obligations of Railways as provided in the Plan.*

(KCPL Ex. 496, p. 1 (emphasis added); IPC Ex. 536.)

147. In compliance with the SEC-confirmed plan and pursuant to an Assumption Agreement entered into by Iowa–Illinois and the trustee appointed on behalf of Railways (Delaware) (*see infra* para. 150), Iowa–Illinois assumed three specific liabilities of Railways (Delaware). Those liabilities were: (1) the liability of Railways (Delaware) to certain former employees; (2) the liability of Railways (Delaware), Continental, and Railways Service to W.I. Brown; and (3) the possible liability of Railways (Delaware) to Central Electric & Gas Company. (Iowa–Illinois Ex. 34, p. 8–10.)

148. In the early 1950s, Iowa–Illinois instituted an action in the Delaware Court of Chancery to ascertain with finality whether there were any unknown valid claims against or liabilities or expenses of Railways (Delaware). (KCPL Ex. 702, Response of Iowa–Illinois to KCPL Request to Admit No. 46.)

149. In its application to the Delaware Court of Chancery Iowa–Illinois described itself as Railways' "equitable stockholder and creditor." (KCPL Ex. 702, Response of Iowa–Illinois to KCPL Request to Admit No. 47.)

150. In appointing a trustee for the dissolution of Railways, the Delaware court noted that Iowa–Illinois was Railways' "sole equitable stockholder." (KCPL Ex. 702, Response of Iowa–Illinois to KCPL Request to Admit No. 48.)

151. The Chancery Court of Delaware appointed John Dern, a partner in the Chicago law firm of Sidley, Austin & Burgess, and a former director and president of Railways (Delaware) as trustee for the dissolution of Railways (Delaware). On August 24, 1954, Iowa–Illinois and trustee John Dern executed an Assumption Agreement wherein Iowa–Illinois agreed to assume specific debts and liabilities of Railways (Delaware). (KCPL Ex. 702, Response of Iowa–Illinois to KCPL Request to Admit No. 49, 50.)

152. Iowa–Illinois, outside of the Assumption Agreement, also succeeded to Railways' (Delaware) (and Power's) responsibility to the IRS for past tax years for the Power and Railways (Delaware) groups of companies.

153. Iowa–Illinois, outside the Assumption Agreement, assumed Railways' (Delaware) and Continental's liabilities under a contract with Columbus and Southern Ohio Gas & Electric Corporation. *See* KCPL Ex. 36, Agreement at 3.

154. Iowa–Illinois acquiesced in the payment, by Railways' (Delaware) trustee, of expired liabilities to former stockholders of Power out of Railways' (Delaware) funds. (IPC Exs. 532, 536, p. 2.)

155. After the payment of all tax claims, attorneys' fees, and known liabilities of Railways (Delaware), Railways (Delaware) had remaining and possessed approximately $1,765,000 in cash and Treasury Bills. (KCPL Ex. 702, Response of Iowa–Illinois to KCPL Request to Admit No. 52.) In accordance with the Delaware Chancery Court's Order of December 22, 1954, the Trustee distributed those moneys to Iowa–Illinois in final liquidation of Railways (Delaware). (KCPL Ex. 702, pp. 31–32, ¶ 53; KCPL Ex. 36, p. 6; IPC Ex. 559; KCPL Ex. 38, p. 2.)

156. In addition to receiving cash from Railways (Delaware), Iowa–Illinois, after the dissolution of Railways (Delaware), was entitled to receive approximately $420,000 in federal income tax refunds that were attributable to Railways (Delaware). (KCPL Ex. 702, Response of Iowa–Illinois to KCPL Request to Admit No. 54.)

157. After the commencement of the dissolution of Railways (Delaware), Railways (Delaware) designated Iowa–Illinois as the successor tax agent for the purposes of certain tax returns for certain of Railways' (Delaware) affiliated groups of corporations. (KCPL Ex. 702, Response of Iowa–Illinois to KCPL Request to Admit No. 58.) Before December 1945, Power acted as the agent for the affiliated group of corporations. (KCPL Ex. 702, p. 33, ¶ 56.) After Power was dissolved, Railways (Delaware) was designated as successor agent for the affiliated group of companies for the purpose of tax returns. (KCPL Ex. 702, pp. 33–34, ¶ 57; KCPL Ex. 38, p. 1.) After Railways (Delaware) commenced its dissolution, Railways (Delaware) designated Iowa–Illinois as its successor agent. (KCPL Ex. 702, p. 34, ¶ 58; KCPL Ex. 38, p. 5; IPC Ex. 522.)

158. On or after December 22, 1954, John Dern, the court-appointed trustee for the dissolution of Railways (Delaware), distributed the remaining cash assets of Railways (Delaware) to Iowa–Illinois, pursuant to an Order of the State of Delaware Chancery Court, dated December 22, 1954, and the dissolution of Railways (Delaware) was thereby completed. (KCPL Ex. 702, Response of Iowa–Illinois to KCPL Request to Admit No. 53.)

159. It is undisputed that Iowa–Illinois never directly owned or operated the Mason City site; never possessed or generated the hazardous substances found at the site; never transported hazardous substances to the site; never acquired any of the assets or stock of People's Gas & Electric Company ("Peoples' (Mason City)"), the company that allegedly caused the coal tar contamination; and never provided gas or electric services to the residents of Mason City, Iowa.

160. The Court repeats and incorporates by reference herein Findings of Fact in IPC's Case against KCPL Nos. 20 through 24 and Nos. 72 through 91.

*KCPL's Acquisition of Peoples' Assets*

161. The court repeats and incorporates by reference herein Findings of Fact Nos. 13–19 in IPC's case against KCPL.

162. Peoples was incorporated in 1906 by two individuals who had established a coal gasification operation in Mason City in 1885. (KCPL Ex. 702, p. 3, ¶ 1; IPC Ex. 56, p. 1.)

163. In 1913, Railways (Maine) acquired the properties of Peoples. (KCPL Ex. 702, p. 3, ¶ 2; IPC Ex. 9, p. 2.)

164. In 1923 or 1924, Power, a Maryland corporation and the successor of Railways (Maine) acquired Peoples' stock. (KCPL Ex. 702, p. 4, ¶ 3; IPC Ex. 9, p. 2; IPC Ex. 35.)

165. Another corporation, Railways (Delaware), became a wholly-owned subsidiary of Power. Railways (Delaware) was also a holding company. (IPC Ex. 573, p. 4; KCPL Ex. 702, p. 5, ¶ 5.) (IPC Ex. 573; KCPL Ex. 702, p. 4, ¶ 4.)

166. By 1932, Power owned Peoples and Railways (Delaware). (IPC Ex. 539, pp. 1, 3.)

167. Besides Railways (Delaware) and Peoples, Power owned nine "first tier" operating utilities, the assets from which Power used to form a new utility in 1940, later named Iowa–Illinois. As mentioned previously, Peoples was not one of the nine "first tier" companies. (IPC Ex. 573; pp. 3, 9; KCPL Ex. 702, p. 5 ¶ 6; KCPL Ex. 12.)

168. Power subjected all of Peoples' assets to a mortgage that secured Power's First Lien and Consolidated Mortgage Bonds. (KCPL Ex. 702, p. 17, ¶ 29(d)).

169. In addition, Power and Peoples shared officers. For example, Mr. Heinke was Peoples' secretary in 1932 and was Power's vice president in 1932. (KCPL Ex. 2; IPC Ex. 539.) Mr. Chamberlain, who was Power's president in 1929 (IPC Ex. 572, p. II000932), and was still member of Power's executive committee in 1932 (IPC 542), was Vice President of Peoples in 1932. (IPC Ex. 540.)

170. At Power's direction, Railways carried insurance on Peoples' assets and operations, even after KCPL purchased the assets. (KCPL Ex. 18.)

171. Railways (Maine), and later Power, through its subsidiary United Light & Power Construction Company, had contractual rights to manage and operate Peoples. (IPC Exs. 13, 19.)

172. The Power holding company group was dismantled under the Public Utility Holding Company Act, 15 U.S.C. § 79, et seq (1935) (Hereinafter PUHCA). (KCPL Ex. 702, p. 15, ¶ 28.)

173. PUHCA eliminated holding companies to counter the following practices, among others:

 a. securities are issued by a subsidiary holding company under circumstances which subject such company to the burden of supporting an overcapitalized structure . . .

 b. subsidiary public utility companies are subjected to excessive charges . . . or enter into transactions in which evils result from an absence of arm's length bargaining or from restraint of free and independent competition . . .

 c. control of subsidiary public-utility companies affects the accounting practices and rate, dividend and other policies of such companies. . . .

15 U.S.C. § 79a(b).

174. KCPL acquired the assets of Peoples on April 11, 1932, through the exercise of an option granted it by Power & Light Securities Company ("P & L"), a wholly-owned subsidiary of Power. (IPC Ex. 39; IPC Ex. 563; *see also* KCPL Ex. 702, p. 6, ¶ 7.)

175. Power created P & L solely to transfer ownership of Peoples' assets and stock.

176. Power first granted P & L an option pursuant to which P & L obtained the option to purchase all Peoples' stock. (KCPL Ex. 702, p. 6, ¶ 8; IPC Ex. 560.)

177. KCPL and P & L executed an Option Agreement dated March 5, 1932, pursuant to which KCPL obtained the option to purchase all of Peoples' assets in exchange for $4,393,750 and KCPL's assumption of Peoples' outstanding liabilities. (KCPL Ex. 702, p. 6, ¶ 9; IPC Ex. 39.)

178. To induce KCPL to exercise its option to purchase Peoples' assets, Power delivered to KCPL a letter dated April 4, 1932, which stated:

> [W]e hereby agree in the event of the exercise of such option by you, . . . . *to also indemnify you against any and all obligations and liabilities of People's Gas & Electric Company which are not set forth in Exhibit "A" attached hereto* and made a part hereof, or which may be incurred otherwise than in the ordinary course of business from April 1, 1932 to the date of conveyance.

(IPC Ex. 47 (emphasis added).)

179. Exhibit "A" to the Power letter makes no mention of liabilities of the type IPC seeks to impose on KCPL in this action. (KCPL Ex. 702, p. 7, ¶ 10; IPC Ex. 47.)

180. On April 4, 1932, KCPL agreed to purchase Peoples' assets. (KCPL Ex. 702, pp. 7–8, ¶ 11; IPC Ex. 563.)

181. On April 4, 1932, P & L exercised its option and purchased Peoples' stock from Power. (KCPL Ex. 702, p. 8, ¶ 12; IPC Ex. 46.)

182. KCPL exercised its option and P & L caused Peoples to convey all Peoples' assets to KCPL. (KCPL Ex. 702, p. 13; IPC Ex. 563.)

183. KCPL accepted Power's offer of indemnification with the following acknowledgment:

> We have exercised the option mentioned above given us by [P & L] and this will evidence our acceptance of your offer with regard to undisclosed liabilities of Peoples' Gas & Electric Company, as set forth above.

(IPC Ex. 47.)

184. Power's Board of Directors then authorized the transaction. (IPC Ex. 33; KCPL Ex. 702, p. 9, ¶ 15.)

185. Power's Board approved the conveyance of Peoples' stock, the notification of the sale of stock and transfer, and the deposit of the transferred cash to reduce specific debt. (KCPL Ex. 702, p. 10, § 16; IPC Ex. 33.)

186. The cash and stock transfers occurred on April 11, 1932. *See* KCPL Ex. 702, p. 8, ¶ 12.

187. In a letter dated April 11, Peoples directed KCPL to pay $4,392,750 to P & L, rather than to Peoples. (KCPL Ex. 2.)

188. The same day, Power sold Peoples' capital stock to P & L in exchange for $4,393,750; Peoples retained $1000 of the purchase price as its only asset. (KCPL Ex. 702, pp. 10–11, ¶ 17.)

189. In a letter dated May 19, 1932 to H.B. Munsell, Power formally delivered for cancellation its stock certificate No. 2, representing its 450 shares of Peoples' common stock. (KCPL Ex. 5.)

190. According to a May 24, 1932 letter from H.B. Munsell to Chester C. Smith, stock certificate No. 3 was issued in the name of P & L, which then owned Peoples. (KCPL Ex. 7.)

191. By May 1932, P & L owned Peoples' stock, although Peoples lacked substantial assets.

192. Ownership of Peoples' stock came to rest in Continental Gas & Electric Co. ("Continental"), which was a subsidiary of Railways (Delaware). (IPC Ex. 573.)

*The Agency Relationship Between KCPL and Peoples*

193. As of April 1, 1932, Peoples and KCPL executed an agency agreement pursuant to which Peoples operated all of the assets purchased by KCPL. The agency agreement specifically vested KCPL with authority to "direct the policy of [Peoples'] in the operation and maintenance" of the Mason City site. (IPC Ex. 70, pp. 23, 75; KCPL Ex. 15, p. 1.)

194. Peoples had no business other than operating its former assets and received only a nominal sum for doing so. *Id.*

195. According to a July 1, 1949 memorandum from Robert Olson to Herbert Munsell, Peoples' management personnel held no offices at KCPL. (KCPL Ex. 15.)

196. From all appearances, Peoples, a third-tier subsidiary of Power (owned by Continental, which Railways (Delaware) owned) operated its former assets as if it still owned them, even acquiring new real estate and personal property in its own name. *See* IPC Ex. 75.

197. Despite the agency arrangement between KCPL and Peoples, and notwithstanding the transfer of ownership of Peoples to Continental during this time, Railways insured Peoples and its employees throughout this period. (KCPL Ex. 18.)

198. The agency arrangement between Peoples and KCPL ended by agreement on March 15, 1950. (IPC Ex. 75.)

199. Under the March 15, 1950 agreement, Peoples conveyed all its assets other than $1,000 in cash to KCPL, and KCPL agreed to perform all "obligations, commitments, contracts and agreements" incurred by Peoples after April 1, 1932, "whether in its own name or as Agent for the principal." (*Id.* at 3, ¶ 3.)

200. Railways (Delaware) removed Peoples from the list of companies that it insured, and Railways (Delaware) extended coverage to all KCPL employees and operations in Mason City. (KCPL Ex. 18.)

*The Liquidation of Continental in 1949*

201. Railways (Delaware) owned 99.86% of Continental, a holding company under Railways (Delaware) and the corporate parent of both KCPL and—at least by 1940—Peoples. (KCPL Ex. 702, pp. 18–19, ¶ 30; IPC Ex. 583, pp. 2–3.)

202. On May 24, 1949, Continental and Railways (Delaware) submitted to the SEC an Application for Approval of Plan (the "Plan"), which provided for the liquidation of Railways (Delaware) and Continental. (KCPL Ex. 702, p. 19, ¶ 31; IPC Ex. 349, p. 1, ¶ 2; IPC Ex. 536.)

203. The SEC approved the Plan (IPC Ex. 549, pp. 1–2, ¶ 2; IPC Ex. 583, p. 25), and the companies carried it out. (IPC Ex. 585, p. 3; IPC Ex. 496; IPC Ex. 549, p. 2, ¶ 3; IPC Ex. 323, p. 2; KCPL Ex. 496.)

204. According to the Plan, Continental transferred to Railways (Delaware) all of Continental's property and assets, and Railways (Delaware) assumed all of Continental's debts and liabilities. (IPC Ex. 578, p. 12, ¶ 9.)

205. Continental distributed its Peoples' stock to Railways (Delaware) in liquidation. (IPC Ex. 517.)

## CONCLUSIONS OF LAW

*General Conclusions of Law*

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, and 42 U.S.C. § 9613(b). Venue lies in this District pursuant to 28 U.S.C. § 1391(b), and 42 U.S.C. § 9613(b), because the claims asserted arose in this District, and because the alleged "release" or threatened "release" of "hazardous substances," as those terms are defined in 42 U.S.C. §§ 9601(14) & (22), occurred and may occur in this District.

Count I of IPC's complaint, against KCPL, arises under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9601, *et seq.*, and specifically under the provisions cited herein, and under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

Count II of IPC's complaint, against KCPL, arises under section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), which provides in part as follows:

Any person may seek contribution from another person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claim shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. . . .

This section and related sections, although part of CERCLA, are sometimes separately referred to as the Superfund Amendments and Reauthorization Act, or "SARA."[2]

SARA was enacted because Congress did not think it enough to permit only the Federal Government, with finite resources, to recoup the costs of cleaning up hazardous waste sites. Through SARA, Congress sought to encourage the clean-up of such sites by allowing private parties to recover a proportion of the costs of clean-up from other potentially responsible parties. *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989).

Counts IV and V of IPC's complaint, against KCPL, seek indemnity and contribution under state law for abatement of a public nuisance.

Count VI of IPC's complaint, against KCPL, seeks indemnity under common law.

Count VII of IPC's complaint, against KCPL, seeks contribution under common law.

Count VIII of IPC's complaint, against KCPL, seeks a declaratory judgment adjudg-

---

**2.** CERCLA and SARA are remedial statutes and are intended to operate retroactively.

ing and declaring that the indemnity provisions of the February 11, 1957 Agreement, and the May 29, 1957 Bill of Sale, between IPC and KCPL do not bar IPC's causes of action.

Count XI of IPC's complaint, against Iowa–Illinois, seeks declaratory relief under CERCLA similar to that sought by IPC against KCPL in Count I.

Count XII of IPC's complaint, against Iowa–Illinois, seeks statutory contribution and other relief under CERCLA similar to that sought by IPC against KCPL in Count II.

Count XIII of IPC's complaint, against Iowa–Illinois, seeks common law contribution similar to that sought by IPC against KCPL in Count VII.

Counts III and IX of IPC's complaint, against KCPL, were dismissed by Judge Hansen in his Order of October 1, 1991. Count X of IPC's complaint, against KCPL, was dismissed by Judge Hansen in his Order of March 26, 1992. Counts XIV and XV of IPC's complaint, against Iowa–Illinois, were dismissed by this Court at trial for the same reasons that Judge Hansen previously dismissed Counts IX and X of IPC's complaint against KCPL.

By Order of Judge Hansen dated March 26, 1992, trial of this cause was bifurcated, and only the liability claims of IPC against KCPL and Iowa–Illinois, and KCPL against Iowa–Illinois, were heard at trial; all damage claims will be tried at a later date.

The site is a "facility" within the meaning of section 101(9) of CERCLA, 42 U.S.C. § 9601(9). "Hazardous substances," as defined in section 101(14) of CERCLA, 42 U.S.C. § 9601(14), are present and have been stated by the EPA to be present at the site in the form of coal tar and/or water gas tar residues, described by the EPA as oily sludges, and component or constituent chemicals originating or emanating from such tar. The actual, and potential for, spillage, leaching, leakage, and escaping of the aforesaid "hazardous substances" in the ground at the site and possibly into Willow Creek adjacent to the site and into underground waters and other waterways, and the depositing of said substances on the ground and groundwater at the site, constitute an actual or threatened "release" into the environment, as defined by section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

An actual controversy exists between IPC and KCPL within the meaning of 28 U.S.C. § 2201.

Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides in part that any person who has incurred necessary costs of response with respect to the clean-up of a hazardous substance or substances may recover such costs of response from, among others, "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." IPC is a person who has incurred costs of a response as defined in section 101(25) of CERCLA, 42 U.S.C. § 9601(25). Some or all of the response costs incurred by IPC because of the contamination at the site have been implemented in a manner consistent with the applicable provisions of CERCLA and with the national contingency plan, 40 C.F.R. § 300, et seq.

KCPL and Iowa–Illinois are persons as defined in section 101(21) of CERCLA, 42 U.S.C. § 9601(21). KCPL is a responsible party under CERCLA, 42 U.S.C. § 9607(a), and has so admitted, subject to the Court's decision regarding its indemnification defense. Iowa–Illinois potentially is a responsible party under CERCLA, 42 U.S.C. § 9607(a), subject to the Court's determination of its status as a successor corporation.

The only available defenses to a CERCLA cause of action, other than the private party indemnity agreement defense raised by KCPL are those statutory defenses set forth in CERCLA, section 107(b), which provides in pertinent part:

There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damage resulting therefrom were caused solely by—

(1) An act of God;

(2) An act of war;

(3) An act or omission of a third party other than an employee or agent of defendant, or than one whose act or omission occurs in connection with a contractual relationship ... [and then only if defendant took certain due care and precaution]; or

(4) A combination of the foregoing paragraphs.

None of the statutory defenses set forth in CERCLA, section 107(b), are applicable to this case and neither KCPL nor Iowa–Illinois can avail themselves of any of those defenses in this case.

■ Neither plaintiff's state of mind nor knowledge of a preexisting contamination is a permitted defense under CERCLA. *General Electric v. Litton Industrial Automation Systems, Inc.*, 920 F.2d 1415, 1418 (8th Cir. 1990).

*Conclusions of Law Re: IPC's CERCLA Claims Versus KCPL*

The primary defense asserted by KCPL against IPC's CERCLA claims—Counts I, II, and VIII—and indemnity and contribution claims—Counts IV, V, VI, and VII—is indemnification. KCPL argues that when it sold the Mason City plant to IPC, IPC contractually agreed to indemnify KCPL against liability for all claims, including the claims now asserted by IPC. KCPL concedes that it is liable to IPC on the CERCLA claims if the Court rejects its indemnification argument. KCPL does not concede its liability on IPC's other claims if the Court rejects the indemnification defense.

■ IPC has urged the Court to adopt a rule prohibiting the enforcement of an indemnification agreement as a defense in cases arising under CERCLA, based on *AM Int'l, Inc. v. International Forging Equip. Corp.*, 743 F.Supp. 525 (N.D.Ohio 1990). KCPL resists adoption of an absolute prohibition of indemnification defenses. The Court rejects IPC's suggestion for two reasons. First, the district court opinion upon which IPC relies was reversed by the Court of Appeals for the Sixth Circuit. *See AM Int'l, Inc. v. International Forging Equip. Corp.*, 982 F.2d 989 (6th Cir.1993). Second, the same district court's reasoning is contrary to the overwhelming weight of authority, as is demonstrated in the remainder of this section of the Court's Conclusions of Law.

Section 107(e)(1) of CERCLA, 42 U.S.C. § 9607(e) provides:

No indemnification, hold harmless or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release· or threat of release under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

After some initial turbulence, the law has become fairly well-settled that § 9607(e)(1) prohibits responsible parties from escaping liability to the United States, but does not prohibit contractual transfers of ultimate financial responsibility among private parties. To date, that has been the ruling of every United States Court of Appeals that has interpreted § 9607(e)(1), though it should be noted that this Court has discovered no cases in which the Court of Appeals for the Eighth Circuit has had occasion to address the issue. *John S. Boyd Co., Inc. v. Boston Gas Co.*, 992 F.2d 401, 405 (1st Cir.1993); *Commander Oil Corp. v. Advance Food Service Equip.*, 991 F.2d 49, 51 (2nd Cir.1993); *United States v. Hardage*, 985 F.2d 1427, 1433 (10th Cir. 1993); *AM Int'l, Inc. v. International Forging Equip. Corp.*, 982 F.2d 989, 994–95 (6th Cir.1993); *Niecko v. Emro Marketing Co.*, 973 F.2d 1296, 1300–01 (6th Cir.1992); *Jones–Hamilton Co. v. Beazer Materials & Services, Inc.*, 973 F.2d 688, 692 (9th Cir. 1992); *Hudson Ins. Co. v. American Elec. Corp.*, 957 F.2d 826, 830 n. 5 (11th Cir.1992) (in dicta); *E.G. Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86, 89 (3d Cir.1988); *Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1458–60 (9th Cir.1986). The task for this Court is to determine the validity of the agreement between IPC and KCPL.·

■ Federal law governs the validity of liability-shifting agreements. *Boyd*, 992 F.2d

at 406; *Village of Fox River Grove, Ill. v. Grayhill, Inc.,* 806 F.Supp. 785, 793 (N.D.Ill. 1992). Federal courts have turned to state contract law for guidance in interpreting indemnification agreements, so long as state law is not hostile to the federal interests animating CERCLA. *Boyd,* 992 F.2d at 406 (citing cases); *see also Fox River Grove,* 806 F.Supp. at 793. The emerging standard is that an "agreement which shows that the parties intended to resolve all their disputes involving any type of claim includes CERCLA claims, even if the agreement is framed in general terms and does not specifically refer to CERCLA or to environmental liability. However, if the agreement appears to be limited to specific disputes or particular types of liability, CERCLA liability will be excluded unless the agreement contains a clear, unambiguous reference to such liability." *Purolator Products Corp. v. Allied–Signal, Inc.,* 772 F.Supp. 124, 130 (W.D.N.Y. 1991) (citations omitted); *see also Hatco Corp. v. W.R. Grace & Co.—Connecticut,* 801 F.Supp. 1309, 1317–18 (D.N.J.1992) (contractual transfers of liability must expressly refer to environmental liabilities or transfer all liabilities whatsoever). This Court previously has found that Iowa law in relation to indemnity agreements is consistent with this federal standard, therefore, the Court will apply Iowa law. *3/26/92 Order of Judge Hansen* at 28 (hereinafter *3/26/92 Order.*)

■ In Iowa, "a party may contract for indemnification of damages to which it contributed, if the agreement clearly provides for it." *Payne Plumbing & Heating Co., Inc. v. Bob McKiness Excavating & Grading, Inc.,* 382 N.W.2d 156, 160 (Iowa 1986). An agreement purportedly indemnifying a party for its own negligence will not be so construed unless it is "clear and unequivocal." *Id.* In ascertaining the meaning of an indemnification agreement, "the court must determine the intention of the parties as revealed by the language used, taken as an entirety, and the situation of the parties, the attendant circumstances, and the objects sought." *Folkers v. Southwest Leasing,* 431 N.W.2d 177, 184 (Iowa App.1988). Parol evidence is admissible to interpret the contract. *Id.* The party claiming indemnity bears the

burden of proof. *Evans v. Howard R. Green Co.,* 231 N.W.2d 907, 917 (Iowa 1975).

The Court previously determined, for purposes of summary judgment, that the indemnity clauses are not "clear and unequivocal" as a matter of law. *3/26/92 Order* at 29; *10/1/91 Order of Judge Hansen* at 16 (hereinafter *10/1/91 Order.*) Further, in light of the extrinsic evidence offered in support of the parties' motions for summary judgment, this Court held that the interpretation of the indemnity provisions involved genuine issues of material fact. *Id.* Because of its prior rulings, the Court heard substantial testimony and received numerous exhibits concerning the meaning of the indemnity clauses. Both parties, however, have invited the Court to reconsider its conclusion that the indemnity clauses are not clear and unequivocal. IPC contends that based on the contract language alone the Court can conclude that CERCLA liability clearly and unequivocally is not covered. KCPL asserts that based on the contract language alone the Court can conclude that CERCLA liability clearly and unequivocally is covered.

■ Based both on the Court's interpretation of the language of the indemnity provisions and its consideration of the extrinsic evidence—the testimony and exhibits, the Court finds that KCPL is not entitled to indemnification from CERCLA liability. The indemnity clauses do not specifically address CERCLA or environmental liability. Nor are the clauses so broad and all-inclusive as to convince the Court that the parties intended once and for all, clearly and unequivocally, to settle all disputes between them. *Boyd,* 992 F.2d at 407; *Purolator,* 772 F.Supp. at 130; *Payne Plumbing & Heating,* 382 N.W.2d at 160. The Court discusses the contract language first and then the extrinsic evidence.

*1. Contract Language.*

As previously stated, the indemnity clauses at issue in this case do not and could not expressly refer to CERCLA liability, as the contract was executed over twenty years before the effective date of CERCLA. Likewise, the indemnity clauses do not specifically refer to general environmental liability.

The question for the Court is whether the contract is broad enough to cover CERCLA liability notwithstanding the fact that CERCLA or CERCLA-like liabilities are not specifically mentioned.

There are three indemnity clauses in the various documents concerning IPC's purchase of the Mason City site. The first indemnity clause is contained in the Agreement. (IPC Ex. 86). At page 13, paragraph 8(c), the Agreement states that:

"The Buyer [IPC] covenants and agrees with the Seller [KCPL] that the Buyer will take possession and control of the Iowa Properties at 5:00 p.m., Central Standard Time, on the Closing Date and that from and after such time the Buyer will assume and will indemnify the Seller against all liabilities and obligations of every kind and character whatsoever arising subsequent to then [sic] Closing Date as pertain to the business and operations of the Iowa Properties, including obligations and liabilities arising subsequent to the Closing Date on account of contracts and other commitments made by the Seller in the ordinary course of business prior to the Closing Date, except any liability arising out of certain litigation now pending in the United States Court of Appeals for the Eighth Circuit, entitled *First Iowa Hydro Electric Cooperation, et al., v. Iowa–Illinois Gas and Electric Company, et al.,* Civil Nos. 15548 and 15549."

(emphasis added). The second indemnity clause is contained in the Bill of Sale, and provides that:

PROVIDED, THAT the Buyer shall, and by its acceptance hereof does, assume and indemnify the Seller against all of the Seller's liabilities and obligations of every kind and character whatsoever arising subsequent to the date hereof as pertain to the business and operations of the Iowa Properties, including obligations and liabilities arising subsequent to the date hereof on account of contracts and other commitments made by the Seller in the ordinary course of business prior to the date hereof, and, in particular, the Seller's liabilities for gas and electricity purchased and unbilled prior to the date hereof, and all other

current and accrued liabilities of the Seller as of the date hereof, including deferred credits to the extent they constitute liabilities and refundable contributions in aid of construction, all as related to the Iowa Properties and for which a credit adjustment to the purchase price hereof has been made by the Seller; and the Buyer shall, and by acceptance hereof does, assume the Seller's obligations under its collective bargaining agreement dated October 17, 1956, with Local Union No. 432 of the International Brotherhood of Electrical Workers, the Retirement Annuity Plan underwritten by The Equitable Life Insurance Society of the United States and contract dated July 28, 1939, as amended, the Group Life Insurance Plan with The Travelers Insurance Company, Hartford, Connecticut, dated February 5, 1954, and effective January 1, 1954, as amended, and the Health and Accident Benefit Plan with Hospital Service, Inc. of Iowa under an enrolling agreement dated December 12, 1952.

(KCPL Ex. 60, pp. 590–595.) The final indemnity clause is contained in the Assignment of Franchise, and similarly provides that IPC assume all liabilities and obligations in relation to the Franchise to operate the Mason City site, and indemnify KCPL therefor. (KCPL Ex. 60, pp. 634–635; IPC Ex. 140(b)).

Though seemingly broad and all-inclusive terms are used to describe the liabilities assumed, the indemnity provisions contain limitations concerning what those liabilities are and how or from where those liabilities may arise. In other words, the scope of the indemnity provisions is not plainly obvious. Therefore, the Court must attempt to discern the scope of those provisions from the language used.

The first indemnity clause requiring IPC to assume and indemnify against "all liabilities and obligations of every kind and character whatsoever" is limited in the first instance by the phrase "as pertains to the business and operations of the Iowa Properties." (IPC Ex. 86, para. 8(c), p. 13). The term "Iowa Properties" is not defined specifically in the Agreement. Rather, paragraph 1 of the Agreement refers to the purchase of

all properties, assets, etc., "constituting Seller's Peoples' Gas & Electric Division, an electric, gas and hot water utility property," and further incorporates the Ebasco Report (IPC Ex. 11) as a more detailed description of the "Iowa Properties."

The Ebasco Report contains a section entitled "Property and Resources," which purports to be a description of the various properties, plants, and contracts that make up the utility property. (IPC Ex. 11, pp. 23–34). The only reference made in the Ebasco Report about coal tar or the manufactured gas plant that would have produced the coal tar is the statement "[i]n 1951–1952 the adjoining manufactured gas plant and holder were *removed*, releasing the space for power station use." (IPC Ex. 11, p. 27) (emphasis added). Nowhere in any of the purchase documents is there any reference to or disclosure of buried coal tar or any other potential environmental liability.

KCPL objects to any suggestion that the underground structures and coal tar were not part of the "Iowa properties." Indeed, KCPL makes fun of this argument when contending that the only issue is whether CERCLA liability arose before or after the closing date. KCPL appears to be arguing for a completely literal meaning of "Iowa properties," insisting that the sale included the real property and everything in it.

By insisting on a literal meaning, KCPL appears to be missing the point. Of course the real property was part of the "Iowa properties," but the term was not used in an overly simplistic, literal sense. The heart of the "deal" was the sale of an on-going business, not simply a sale of land. The term "Iowa properties" as used in the sale documents was a term of art used to describe that on-going utility business. The liabilities for which IPC was indemnifying KCPL were those that naturally flow from the on-going business as it existed at the time of the sale. The term "Iowa properties" describes the on-going utility business as it existed at the time of the sale. Understanding the meaning of the term "Iowa properties" is crucial to understanding the meaning of the indemnity clause and the intent of the parties in relation thereto.

The first indemnification clause also is followed by language identifying specific liabilities and obligations to be assumed and other liabilities that were to be excepted from assumption and indemnification. Paragraph 8(c) includes within the assumption and indemnification all "contracts and other commitments made by the Seller [KCPL] in the ordinary course of business prior to the Closing Date," but excludes two cases then pending before the United States Court of Appeals for the Eighth Circuit. Paragraph 8(c) contains no language preserving the generality of the initial assumption and indemnification in the face of the identification of certain specific liabilities and obligations.

The second indemnification clause, found in the Bill of Sale (KCPL Ex. 60, pp. 590–95), also combines seemingly broad language and apparently limiting language. Just like the indemnification clause in the Agreement, this indemnification clause is limited by the language "as pertain to the business and operations of the Iowa Properties, . . . ." (KCPL Ex. 60, pp. 593–94). As this Court previously noted, no definition of "Iowa Properties" refers to coal tar, buried coal tar, or potential environmental liability. Rather, the Ebasco Report notes that the manufactured gas plant had been removed.

Just like the indemnification clause in the Agreement, the indemnification clause in the Bill of Sale specifies "contracts and other commitments . . . made in the ordinary course of business" as liabilities and obligations to be assumed. (KCPL Ex. 60 p. 594). Unlike the Agreement, the indemnification clause of the Bill of Sale further and more particularly specifies "gas and electricity purchased and unbilled prior to the date hereof, and all other current and accrued liabilities of the Seller [KCPL] as of the date hereof, including deferred credits" and the obligations under a collective bargaining agreement, a retirement plan, and a health and accident benefits plan as liabilities and obligations IPC would assume and indemnify KCPL for. *Id.* No language in the Bill of Sale preserves the generality of the assumption and indemnification clause over and above the specific liabilities and obligations identified.

The final indemnification clause is found in the Assignment of Franchise (KCPL Ex. 60, p. 635), wherein IPC assumed and indemnified KCPL for all liabilities and obligations arising subsequent to the assignment "as pertain to said Franchise and Ordinance." *Id.* The "Franchise and Ordinance" is a grant of permission from the City of Mason City to conduct business and provides:

An ordinance granting a franchise to the Peoples' Gas & Electric Company, its successors and assigns, to construct, extend, maintain, repair, and operate gas works and a gas distribution system in the City of Mason City, Iowa, for the manufacture, distribution, and vending of gas, fixing the method of determining the rates to be charged for gas in said City, and regulating the manner of exercising said franchise,

*Id.* at 634. As is evident from the quoted language, the reference to the manufacture of gas is minimal and would not put IPC on notice of a buried MGP and related coal tar contamination.

The Court finds that KCPL is not entitled to indemnification on the basis of the indemnity clauses in the documents regarding IPC's purchase of the Mason City utility business. The indemnity clauses lack the necessary clarity to satisfy the strict requirements of Iowa law and, hence, federal law concerning indemnification agreements in CERCLA cases. *Payne Plumbing & Heating,* 382 N.W.2d at 160; *Evans v. Howard R. Green Co.,* 231 N.W.2d at 917. This is especially true when the indemnification clauses are read *in para materia* with the rest of the purchase documents. For example, paragraph 1 of the Agreement includes language the preserves the generality of paragraph 1 even though the paragraph contains references to specific items that are being sold. The indemnity clauses, as previously noted, contain no such generality preserving language. Further, no appendices, exhibits, attachments, indices, or the like that describe properties or liabilities involved in the sale make any reference to a manufactured gas plant or byproducts or wastes or pollution related to the manufacturing of gas. *See, e.g.,* IPC Ex. 86, Exhibit A; KCPL Ex. 60, pp. 313–15 & 330.

The price adjustment provisions also bolster this conclusion. The reason for the price adjustment provisions was that the ongoing utility business accrued assets and liabilities on a continual basis. For example, gas and electric services generated new accounts receivable, and purchase of natural gas created new debts. The parties needed to make sure the price reflected those changes. However, neither CERCLA liability nor CERCLA-like liabilities were among the concerns identified by KCPL witness Arthur Doyle (A.J. Doyle) as necessitating price adjustments. Rather, the accruing assets and liabilities were those commonly encountered in the operation of a business, the usual debits and credits.

The important inference to be drawn is that the price was not adjusted to reflect the risk of indemnification. Because none of the factors considered to be relevant to the price adjustment included CERCLA or CERCLA-like liabilities, it cannot be said that IPC in any way bargained for a price reflective of assuming the risk of subsequent environmental liability. In other words, IPC did not say, in effect, "OK, we agree to pay only 19 million now because we may have to pay thousands or millions in CERCLA clean-up costs later."

KCPL's reliance on contract references to "gas production facilities" as proof that the old MGP was part of the deal is misplaced. The contract documents specifically identify a propane gas plant at a different location that was used for peak shaving purposes as the "gas production facility." Furthermore, the only "gas production facility" relevant to the ongoing utility business that IPC was buying was the propane gas plant and not the old coal tar generating manufactured gas plant.

A survey[3] of the cases analyzing indemnification or similar agreements further per-

---

**3.** The Court has not attempted to discuss each and every case interpreting indemnity agreements under CERCLA. Rather, the Court has discussed in the text those cases that most accurately and thoroughly reflect the analytical process used by federal courts to determine the

suades the Court that KCPL is not entitled to indemnification from CERCLA liability. In *John S. Boyd Co., Inc. v. Boston Gas Co.*, 992 F.2d 401 (1st Cir.1993), while recognizing the indemnification defense as a legitimate defense, the First Circuit rejected the defense raised in that ·case. *Id.* at 406–07. The Circuit Court held that seemingly broad language in an indemnification clause does not cover CERCLA liability where the agreement also later lists some of the liabili- · ties and obligations covered and does not make reference to other unknown, future, or contingent liabilities. *Id.* The situation faced by the *Boyd* court· appears to be very similar to the situation in the present case. This Court concurs in the Boyd ruling and believes it is worthwhile to quote at some length from the *Boyd* opinion. Judge Tourrella wrote:

> While initially the Agreement provides that "Lynn Gas will assume and takeover all liabilities" related to the gas business, the Agreement later lists those obligations. The series contains obligations pertaining only to the existing business, such as obligations to serve gas customers, honor contracts for the purchase and sale of new facilities, and provide reserves to account for bad debt and depreciation on the gas plant. No reference is made to any future or contingent liabilities.

> An indenture entered into by the parties several months later contains a similar list. A catch-all provision on liability refers to the liabilities "indicated in summary form by the balance sheet" attached to the document revealing an intent that the only liabilities assumed were those known, existing, and somehow accounted for at the time of execution. It is true that the indenture states that the liabilities specifically assume are "without implied limitation." But it is one thing to say that the list of liabilities is not all-inclusive and quite another to assume that the obligations not specified include then non-existent environmental liabilities to be created under CERCLA and unforeseeable when the agreement was made.

> We must conclude that neither document evidences the intent to transfer environmental liability in the requisite broad language....

*Boyd,* 992 F.2d at 407.

In *Commander Oil Corp. v. Advance Food Serv. Equip.,* 991 F.2d 49 (2d Cir.1993), the Second Circuit upheld the general rule that indemnification agreements between private parties are enforceable. *Id.* at 51. However, the court found a catch-all indemnification clause to be ambiguous in part because the clause used both broad language and restrictive language. *Id.* at 54–55. The court also noted that the listing of assets, liabilities, and litigations did not refer to environmental liabilities or possible environmental liabilities that would or could arise post sale as a result of presale conduct. *Id.*

In *United States v. Hardage,* 985 F.2d 1427 (10th Cir.1993), the Tenth Circuit upheld an indemnification clause that covered "any claim of loss or damage." *Id.* at 1434–35. Important to the court was the fact that the indemnification clause did not otherwise

validity and effect of indemnification agreements and upon which the Court has principally relied in reaching its decision. For reference purposes, the Court notes *American Policyholders Ins. Co. v. Nyacol Products, Inc.,* 989 F.2d 1256 (1st Cir. 1993); *Hudson Ins. Co. v. American Elec. Corp.,* 957 F.2d 826 (11th Cir.1992); *E.G. Smith Land & Improvement Corp. v. Celotex Corp.,* 851 F.2d 86 (3d Cir.1988); *Armotek Indus., Inc. v. Freedman,* 790 F.Supp. 383 (D.Conn.1992); *Hudson Ins. Co. v. Double D Mgmt Co., Inc.,* 768 F.Supp. 1538 (M.D.Fla.1991); *Mobay Corp. v. Allied–Signal, Inc.,* 761 F.Supp. 345 (D.N.J.1991); *Rodenbeck v. Marathon Petroleum Co.,* 742 F.Supp. 1448 (N.D.Ind.1990); *Southland Corp. v. Ashland Oil, Inc.,* 696 F.Supp. 994 (D.N.J.1988); *Versatile Metals, Inc. v. Union Corp.,* 693 F.Supp. 1563 (E.D.Pa.1988); *Chemical Waste Mgmt, Inc. v. Armstrong World Indus., Inc.,* 669 F.Supp. 1285 (E.D.Pa.1987); *FMC Corp. v. Northern Pump Co.,* 668 F.Supp. 1285 (D.Minn.1987). These cases decide issues other than indemnification agreements or state a rule of law that is now not fully in accord with the more settled rule stated in the text or involve side issues such as whether or not certain timing provisions or other conditions have been satisfied that trigger the indemnification agreement, but do not interpret the indemnifying language. The Court has considered these cases and the cases no doubt have shaped the Court's conclusions, but the cases cited and discussed in the text are the primary authorities upon which the Court bases its opinion.

limit or specify what the claims of loss or damage might be. *Id.*

In *AM Int'l, Inc. v. International Forging Equip. Corp.,* 982 F.2d 989 (6th Cir.1993), the Sixth Circuit also upheld the right of private parties to transfer liability by contract, *id.* at 995–95, but struck down the release on the basis of Ohio law of mutual mistake. *Id.* at 995–97. The rejected contract language in *AM Int'l* was even broader than is present in KCPL's indemnification agreement. The release at issue covered "any and all manner of actions, [etc.] ... whatsoever of every kind and description, known or unknown, in law or equity, which AMI now has or may hereafter him...." *Id.* at 993. Though based on the law of mutual mistake, the reasoning is persuasive in that the Sixth Circuit would not infer coverage of CERCLA liability where environmental liability was not contemplated by the parties. *Id.* at 995–97; *compare Niecko v. Emro Marketing Co.,* 973 F.2d 1296, 1300–01 (6th Cir.1992) (specific responsibility for conditions of property allocated and price reflected that allocation). This reasoning is consistent with the Iowa rule that general, catch-all language usually is not sufficient to indemnify a party against its own actions. *Evans v. Howard R. Green Co.,* 231 N.W.2d 907, 916 (Iowa 1975).

In *Jones–Hamilton Co. v. Beazer Materials & Servs., Inc.,* 973 F.2d 688 (9th Cir. 1992), the Ninth Circuit upheld an indemnification agreement that required Jones–Hamilton to comply with all applicable federal environmental laws and to indemnify Beazer against its failure to do so. *Id.* at 693. In *Jones–Hamilton,* the parties were dealing specifically with chemical materials, the disposal thereof, and federal laws in relation thereto. *Id.* Therefore, the court found that the agreement covered CERCLA, even though CERCLA liability arose long after the indemnification agreement was executed. *Id.*

In *Mardan Corp. v. C.G.C. Music, Ltd.,* 804 F.2d 1454 (9th Cir.1986), the Ninth Circuit upheld a private indemnity agreement that covered "[all claims] arising out of or in any way relating to the Purchase Agreement" and any other issues that might arise between them. *Id.* at 1461–62. The *Mar-*

*dan* court was persuaded that the agreement was meant to resolve all matters that existed or could exist between the parties, and made specific findings that there was no mutual mistake of fact. *Id.* at 1462–63.

In *Olin Corp. v. Consolidated Aluminum Corp.,* 807 F.Supp. 1133 (S.D.N.Y.1992), the district court upheld a broad indemnity agreement even though the agreement did not refer specifically to environmental liability. *Id.* at 1142–43. The indemnification agreement applied to all that might arise from Olin's actions or failure to act prior to the sale and "releases and settles all claims of any nature which CONALCO now has or hereafter could have against Olin...." *Id.* at 1135–36. The district court found that this language plainly evidenced an intent to resolve and dispose of all issues. *Id.* at 1142–43. This indemnification release is notably different from the language at issue in the present case in that KCPL remained liable on certain matters that were expressly excepted from assumption and indemnification.

In *Village of Fox River Grove, Ill. v. Grayhill, Inc.,* 806 F.Supp. 785 (N.D.Ill.1992), the district court upheld a release as a defense against a CERCLA claim. *Id.* at 794–95. The release used broad language which the district court found evinced an intent to finally resolve all claims between the Village and Grayhill. *Id.* at 794. The release also specifically addressed environmental liability by releasing all of the Village's claims of violation of a village ordinance regarding water contamination. *Id.* Also important to the decision was language in the release that preserved the generality and all-inclusiveness of the release notwithstanding the fact that the release also addressed specific matters. *Id.* The agreements between KCPL and IPC contain no such language preserving the generality of the indemnity clauses.

In *Hatco Corp. v. W.R. Grace & Co.— Connecticut,* 801 F.Supp. 1309 (D.N.J.1992), the district court rejected an indemnification agreement as insufficient to cover CERCLA liability. *Id.* at 1318–20. The district court held that an indemnification agreement that contains specific enumerations of the liabilities assumed, none of which are environmen-

tal liabilities, and also contains an express retention of other liabilities, is not broad or all-inclusive enough relieve a party of CERCLA liability. *Id.* The district court also rejected arguments concerning the drafting history and the knowledge of employees. *Id.* at 1321–22.

In *Danella Southwest, Inc. v. Southwestern Bell Tel. Co.,* 775 F.Supp. 1227 (E.D.Mo. 1991), the district court held that a general indemnity provision requiring safe and careful performance of contracts was not enough to shift CERCLA liability. *Id.* at 1241–42. The court was especially persuaded by the fact that the scope of the provision did not extend beyond the overall scope of the contract, which was for excavation and transportation of materials. *Id.*

In *Purolator Products Corp. v. Allied–Signal, Inc.,* 772 F.Supp. 124 (W.D.N.Y. 1991), the district court upheld an indemnification agreement as a defense to a CERCLA claim. *Id.* at 133–34. The agreement at issue applied to "all liabilities and obligations ..., secured or unsecured (whether accrued, absolute, contingent or otherwise) ..." and did not contain language that otherwise indicated an intent to limit to breadth of the agreement. *Id.* at 131. An important aspect of the *Purolator* case that is perhaps most applicable to the present case, is the court's analysis of the scope of the underlying agreement and the relationship between the indemnity provision and the underlying agreement. *Id.* at 133–34. Notably, the court found that Purolator was not obligated to indemnify Allied–Signal for CERCLA costs resulting from the operation of a brake and carburetor business, because the brake and carburetor operations were not part of the business sold to Purolator's predecessor. *Id.* at 133. That analysis is particularly persuasive in the case at bar because IPC was not purchasing a manufactured gas plant and the related assets—such as coal tar pits, it was purchasing an existing gas, electric, and water heating utility business located upon property from which the MGP operations. (IPC Ex. 86, para. 1).

This Court is persuaded that the indemnification provisions at issue in this case are most closely analogous to those rejected in

the *Boyd, Commander Oil, AM Int'l, Hatco, Danella,* and *Purolator* cases. The indemnity provisions are written in both broad and restrictive language, including KCPL's express retention of certain liabilities, do not specifically identify environmental liability, and do not contain language preserving the generality of the broad language notwithstanding the specific or restrictive language. As the First Circuit observed in *Boyd* and this Court previously quoted: "[I]t is one thing to say that the list of liabilities is not all-inclusive and quite another to assume that the obligations not specified include then non-existent environmental liabilities to be created under CERCLA and unforeseeable when the agreement was made." *Boyd,* 992 F.2d at 407. KCPL's indemnification defense based on the contract language must also be rejected.

### 2. Extrinsic Evidence.

IPC and KCPL presented the Court with a substantial amount of extrinsic evidence in support of their interpretations of the indemnification clauses. KCPL contends that extrinsic evidence concerning its negotiations with IPC and IPC's familiarity with manufactured gas plants proves that IPC assumed the risk of liability that has arisen from the discovery of coal tar at the Mason City site. It is the Court's opinion that the extrinsic evidence further buttresses the conclusion that CERCLA liability is not covered by the indemnification.

The evidence concerning the parties' understandings during negotiations comes from Arthur Doyle, an attorney for KCPL who was involved in the negotiations, including the drafting of the indemnification clauses. As is set out in the Court's factual findings (pages 6, 9, and 18), Doyle testified that it was KCPL's intent to sell everything it had and cease doing business in Iowa as soon as possible. Doyle testified that KCPL intended for IPC to indemnify KCPL against any and all liability arising in the ordinary course of business and that KCPL believed that any unknown and unforeseen liabilities arising after the sale would be borne by IPC. In response to questions from the Court, Doyle testified that there was no visible evidence of

a manufactured gas plant at the Mason City site and further testified that nobody discussed environmental liability during the negotiations, especially not then non-existent CERCLA liability.

Arthur Doyle's testimony does not persuade the Court that the indemnification clauses should be given effect. To begin with, Doyle's testimony must be treated with caution as he was an agent for KCPL and one of the drafters of the agreement. *Evans v. Howard R. Green Co.*, 231 N.W.2d 907, 916 (Iowa 1975) (indemnity agreements strictly construed against drafter). Accordingly, Doyle's contention that all liabilities arising after the sale should be borne by IPC is not alone conclusive.

Furthermore, the Court believes it is possible to interpret the language of the indemnification clauses in the manner the Court has, notwithstanding Mr. Doyle's testimony. Doyle's testimony that IPC assumed all liabilities arising in the ordinary course of business is consistent with the Court's conclusion that the "business" was the then-existing utility business, not the "removed" manufactured gas plant. Doyle's admission that there was no visible remnant of the manufactured gas plant also supports the Court's interpretation of the indemnity provisions. Doyle's ultimate conclusion that liabilities arising in the ordinary course of business includes CERCLA liability is betrayed by the language of the indemnity provision in the Bill of Sale that makes specific reference to contracts, collective bargaining agreements, and the like, as being liabilities arising in the ordinary course of business.

Similarly, evidence concerning IPC's knowledge does not persuade the Court to give effect to the indemnity provisions. As the Court understands KCPL's arguments, there are two aspects to IPC's knowledge. The first aspect is IPC's general knowledge and familiarity with the custom and practice of the manufactured gas industry, namely the practice of burying and covering coal tar pits and cisterns and other underground structures rather than actually removing them. The second aspect is IPC's specific knowledge about the Mason City site, arising from plant drawings and documents and the knowledge of KCPL employees who became IPC employees.

KCPL's argument concerning IPC's specific knowledge can be resolved without substantial elaboration. As set out in the Court's factual findings, there is no evidence that KCPL ever disclosed to IPC the existence of coal tar on the Mason City site and there is no evidence that liability for coal tar was a specific negotiating point. Further, there is no evidence that IPC received the documents identifying the location of subsurface structures—and thus the likely locations of coal tar contamination—*prior* to the completion of the 1957 sale. Finally, KCPL has cited no persuasive CERCLA authority for the position that the knowledge held by KCPL employees who stayed on as IPC employees should be imputed to IPC. *Compare Hatco Corp. v. W.R. Grace*, 801 F.Supp. at 1322 (employee knowledge not enough to support indemnification in CERCLA case). At best the evidence shows that a handful of former KCPL employees had knowledge of the demolition of the old plant and none of them had any reason to raise the issue after becoming employees of IPC.

KCPL also relies on IPC's participation in and knowledge of the customs and practices of the manufactured gas industry to support its interpretation of the indemnity clauses. In particular, KCPL points to IPC's practice of demolishing manufactured gas plants and not disclosing that fact to subsequent buyers, as evidence that IPC knew it was assuming the risk of liability for the coal tar waste found thirty years later. KCPL also refers to the wide body of secondary literature on coal tar as proof of IPC's knowledge. This argument fails for several reasons.

First, the evidence concerning the custom and practice of the industry is weak on the bottom line question of what IPC knew about the Mason City site. There is substantial doubt about how IPC understood the term "removed" as used in the Ebasco Report. There is no evidence in the record showing that it was routine industry practice to demolish and bury an MGP and then characterize the demolition as a removal to prospective buyers. Indeed, the only competent evidence on the issue is the testimony of Mi-

chael Chase. Chase testified that IPC understood "removed" as used in the Ebasco Report "to mean gone period."

Second, the secondary literature, as introduced through the testimony of Scott Harkins, on coal tar is not at all conclusive as to what methods of disposal, levels of contamination, and methods of demolition predominated the industry. It is true that Scott Harkins testified on direct about commonalities between sites where MGPs were decommissioned. However, on cross-examination Harkins admitted that the sites he had studied varied greatly and that only three of the 32 sites he studied involved underground receptacles left in the ground and covered over similar to the situation at Mason City. In response to being asked how many MGPs had been removed, Harkins testified that rarely were entire plants removed and usually only portions would have been removed, a significant statement in light of the Ebasco Report's specific representation that the Mason City site had been "removed." There was no testimony from Harkins, nor any other evidence, suggesting that it was routine industry practice to use the term "removed" to describe the demolition and covering over of an MGP.

Finally, the Court is not convinced that IPC's knowledge of industry practice or IPC's operation of its own MGPs is determinative of the indemnification question. IPC may not have been pure as the driven snow, but does that matter? The question is what did IPC understand it was indemnifying KCPL against.

The Court is not convinced that what might have been common or typical or even frequent practice in decommissioning MGPs is strong enough evidence to impose a certain knowledge or state of mind upon IPC in relation to the meaning of the indemnity clauses. KCPL's evidence of industry custom and practice is not enough to support the assertion that "removed" meant left in the ground. Therefore, KCPL's indemnification defense based on the extrinsic evidence must also be rejected.

In sum, the Court concludes that neither the language of the indemnity clauses nor the extrinsic evidence offered in support of

KCPL's interpretation thereof warrants the conclusion that IPC intended to indemnify KCPL against CERCLA-like liability nor did the parties intend for all possible unknown, future, remote, or contingent liabilities to fall within the coverage of the indemnity clauses. Accordingly, judgment shall be ordered in favor of IPC on Counts I, II, and VIII of its Complaint, and against KCPL on its counterclaim.

*Conclusions of Law Re: IPC's State Law Claims*

In Counts IV and V, IPC asserts state claims of indemnity and contribution for abatement of a public nuisance. The alleged nuisance involves Willow Creek, which flows near the Mason City site. KCPL argues that IPC lacks standing to assert a public nuisance claim. KCPL further argues that IPC's nuisance claim lapsed in 1957 or 1958, when IPC began collecting tars in distribution lines in Mason City. Finally, KCPL argues that IPC cannot establish a public nuisance.

This Court previously has determined that IPC has standing to bring its nuisance claims or at least very likely can establish standing. *10/1/91 Order.* The Court held that IPC probably has suffered a harm sufficient to confer standing. Neither the facts nor the law have changed since the Court reached that conclusion, KCPL merely disagrees. The Court declines KCPL's invitation to revisit that ruling. IPC has standing to pursue its nuisance claims.

Before IPC can seek indemnification or contribution for abatement of a public nuisance, it must first establish the existence of a nuisance. To establish a public nuisance, IPC must show "an unreasonable interference with a right common to the general public." Restatement (Second) of Torts § 821B(1); *3/26/92 Order* at 17; *10/1/91 Order* at 22, 34. Chemical contamination of land can constitute a public nuisance. *Mel Foster Co. Prop. v. American Oil Co.*, 427 N.W.2d 171, 175 (Iowa 1988); *see also New York v. Shore Realty Corp.*, 759 F.2d 1032, 1051 (2d Cir.1985).

■ The Court agrees with KCPL that IPC has failed to establish the existence of a public nuisance. IPC has not shown that coal tar contamination at the Mason City site has unreasonably interfered with the public's use of Willow Creek, or any other right common to the public. At best, the evidence introduced by IPC shows that contaminants have been found in the sediment bed of Willow Creek. IPC has not shown any resulting interference with use. The historical literature describing possible nuisance conditions arising from coal tar contamination is not enough for this Court to find a public nuisance at the Mason City site.[4] Without a nuisance, there is nothing for which IPC can be indemnified or seek contribution. Accordingly, judgment shall be ordered in favor of KCPL on Counts IV and V.

■ In Count VI, IPC seeks common law indemnification for physical harm by a condition of land after it took possession of the Mason City site. This Court previously held that IPC must show that it lacked knowledge of coal tar contamination on the site *and* that KCPL actually· concealed the presence of coal tar contamination. *10/1/91 Order* at 27–29. The previous ruling is incorporated by reference.

IPC has failed to carry its burden of showing that KCPL actually concealed anything from IPC. The evidence in this case is unmistakably clear: coal tar contamination was not a topic of discussion between IPC and KCPL. This was not because KCPL was trying to hide anything, but because coal tar contamination was not perceived as a problem in 1957. Indeed, KCPL allowed IPC and its consultant, Middle West Services Company, to speak with employees at Mason City. There is no evidence even hinting at the possibility that KCPL instructed those employees to hide anything during their talks with IPC. The evidence simply will not support a finding of concealment by KCPL.

■ Even if concealment is not an element and IPC can prevail by showing breach of a duty to disclose, IPC still loses. An element of KCPL's duty to disclose is that KCPL knows or should know of the risk of a dangerous condition. Restatement (Second) of Torts § 353(1)(b). In 1957, coal tar waste was not deemed a dangerous condition. It cannot be said that KCPL breached any duty to disclose contamination at the Mason City site. The Court is of the opinion that caveat emptor probably is the rule with regard to this state law claim. *See Kirk v. Ridgway,* 373 N.W.2d 491, 496 (Iowa 1985); *Westwood Pharmaceuticals v. National Fuel Gas Distrib. Corp.,* 737 F.Supp. 1272, 1282–83 (W.D.N.Y.1990). Accordingly, judgment shall be ordered in favor of KCPL on this claim.

■ Count VII of IPC's Complaint asserts a claim for contribution. The Court previously ruled that the statute of limitations had not run on this claim because no judgment had been rendered and because IPC had not discharged or agreed to discharge KCPL's liability. *10/1/91 Order* at 31–32. The Court adheres to its previous ruling.

■ The Court's previous ruling presents a problem for resolving Count VII, however. The problem is that without a judgment or discharge of KCPL's liability, IPC's claim for contribution technically is premature. The Court is persuaded that consideration of judicial economy advises in favor of treating this count as a request for declaratory relief. KCPL has made no other arguments against IPC's contribution claim. Accordingly, judgment shall be entered in favor of IPC. This issue shall be discussed further at the trial on damages.

*Conclusions of Law Re: Liability of Iowa–Illinois*

CERCLA imposes liability on current owners and operators of a facility, former owners and operators at the time of disposal; generators of the hazardous substance; and transporters of a hazardous substance. 42 U.S.C. § 9607(a). Iowa–Illinois does not obviously fall into any one of the four liability categories. Iowa–Illinois never owned or operated the Mason City site; Iowa–Illinois never

---

4. The Court's finding that IPC has failed to carry its burden of establishing the existence of a pub-
lic nuisance eliminates any need for determining if IPC's claim has lapsed.

owned, possessed, or generated the hazardous substances found at the Mason City site; and Iowa–Illinois never transported hazardous substances to the Mason City site. Further, Iowa–Illinois has never acquired any of the assets or stock of Peoples' (Mason City) nor provided utility service to the residents of Mason City, Iowa. As the parties have recognized, Iowa–Illinois can be held liable under CERCLA for the contamination at the Mason City site only as a corporate successor of former owners and operators, particularly Railways (Delaware).

Before addressing the merits of the corporate successor question, it is appropriate to explain the approach of this section of the Court's order. The parties have raised several issues in relation to corporate succession. Because Peoples' (Mason City) was the owner and operator of the site, whether in name only or otherwise, at the time of a substantial part of the generation and disposal of the coal tar found on site, both IPC and KCPL have raised the issue of piercing Peoples' corporate veil. Obviously, this veil piercing is a necessary first step in the chain of demonstrating Iowa–Illinois' liability, for it is only if Peoples' corporate veil is pierced may CERCLA liability be imposed upon an entity for whom Iowa–Illinois is the corporate successor. Likewise, the parties have briefed the questions of corporate succession from Railways (Delaware) to Iowa–Illinois. As the Court understands the pleadings, there are three overarching questions to be resolved, which are: (1) Is Iowa–Illinois the corporate successor of Railways (Delaware) for purposes of imposing CERCLA liability?; (2) Should Peoples' corporate veil be pierced to impose CERCLA liability on Power?; and (3) Even if Peoples' veil is pierced, is KCPL, rather than Iowa–Illinois, the proper party upon which to impose successor liability?

### 1. *Iowa–Illinois As Successor To Railways (Delaware).*[5]

 In the Eighth Circuit, corporate successors "are within the meaning of 'persons' for the purposes of CERCLA liability."

United States v. Mexico Feed and Seed Co., Inc., 980 F.2d 478, 487 (8th Cir.1992); *see also John S. Boyd Co., Inc. v. Boston Gas Co.,* 992 F.2d 401, 405 (1st Cir.1993); *United States v. Carolina Transformer Co.,* 978 F.2d 832, 837 (4th Cir.1992); *Anspec Co., Inc. v. Johnson Controls, Inc.,* 922 F.2d 1240, 1245–47 (6th Cir.1991); *Louisiana–Pacific Corp. v. Asarco, Inc.,* 909 F.2d 1260, 1263 (9th Cir.1990); *Smith Land & Imp. Corp. v. Celotex Corp.,* 851 F.2d 86, 90–92 (3d Cir.1988); *Bowen Engineering v. Estate of Reeve,* 799 F.Supp. 467, 487 (D.N.J.1992); *United States v. Western Processing Co., Inc.,* 751 F.Supp. 902, 905 (W.D.Wash.1990); *United States v. Distler,* 741 F.Supp. 637, 640 (W.D.Ky.1990); *In re Acushnet River & New Bedford Harbor Proceedings,* 712 F.Supp. 1010, 1013 (D.Mass.1989) (hereinafter *Acushnet River II* ). "The purpose of corporate successor liability ... is to prevent corporations from evading their liabilities through changes of ownership when there is a buyout or merger." *Mexico Feed,* 980 F.2d at 487 (citations omitted). "Likewise, exceptions to the traditional rule that mere asset purchasers are not liable as successors developed to prevent corporate evasions of debt through transactional technicalities." *Id.* "Any other result would thwart CERCLA's essential purpose of holding responsible parties liable for clean up costs." *Id.* (citations omitted). Nevertheless, "while successor liability is permitted under CERCLA, it is not required unless justified by the facts of each case." *Carolina Transformer,* 978 F.2d at 837.

 A successor corporation does not take the liabilities of the predecessor corporation unless one of the following applies:

(1) The successor corporation expressly or impliedly agrees to assume the liability;

(2) The transaction amounts to a 'de facto' consolidation or merger;

(3) The successor corporation is merely a continuation of the predecessor corporation; or

---

5. The chains of succession for purposes Iowa–Illinois' liability are set out in Appendix A, a graph that explains the relationships between Peoples, Railways (Maine), Power, KCPL, Railways (Delaware), and Iowa–Illinois.

(4) The transaction was fraudulently entered into to avoid liability.

*Mexico Feed,* 980 F.2d at 487. None of the parties have suggested that the fraud exception applies in this case so the Court devotes its efforts to consideration of the continuation, de facto merger, and assumption of liability theories.

### a. Continuation Theory.

Both KCPL and plaintiff, IPC, argue that Iowa–Illinois should be held responsible for the CERCLA liabilities of Railways (Delaware) on a continuation theory, either under the traditional mere continuation theory or under the emerging "substantial continuity" and/or "continuing business enterprise" test. The Court is persuaded that the evidence will not support a finding of either mere continuation or substantial continuity.

■■■■ The mere continuation theory is relatively narrow, "emphasiz[ing] an 'identity of officers, directors, and stock between the selling and purchasing corporations.'" *Mexico Seed,* 980 F.2d at 487 (quoting *Tucker v. Paxson Machine Co.,* 645 F.2d 620, 626 (8th Cir.1981)). There has been no suggestion, nor would the evidence support such a suggestion, that there was identity of officers and directors between Iowa–Illinois and Railways (Delaware). Furthermore, any stock identity between Railways (Delaware) and Iowa–Illinois is only partial at best, because Railways (Delaware) shareholders also received stock in four other operating companies in addition to Iowa–Illinois stock. Iowa–Illinois is not a mere continuation of Railways (Delaware). *Id.; see also Carolina Transformer,* 978 F.2d at 838 (not a mere continuation because no overlap in stock ownership); *Distler,* 741 F.Supp. at 642 (not a mere continuation because no identity of directors or shareholders).

■■■■ The Eighth Circuit has also adopted and applied the "substantial continuity" test for corporate successorship in the CERCLA context, also known as the "continuing business enterprise test," in the *Mexico Seed* case. *Mexico Seed,* 980 F.2d at 488–90. "The test considers an identity of stock, stockholders, and officers, but not determinatively. It also considers whether the purchaser retained the same facilities, same employees, same name, same production facilities in the same location, same supervisory personnel; and produced the same product; maintained a continuity in assets; continued the same general business operations; and held itself out to the public as a continuation of the previous enterprise." *Id.* at 488 n. 10 (citations omitted). It also appears that notice—i.e. whether the parties have knowledge of actual or potential environmental liability and the transfer is an attempt to avoid environmental liability—is a relevant factor under the substantial continuity test. *Id.* at 489; *Carolina Transformer,* 978 F.2d at 838; *Asarco,* 909 F.2d at 1265–66; *Acushnet River II,* 712 F.Supp. at 1012 & 1019.

■■■■ Applying these factors, the Court finds that Iowa–Illinois is not a substantial continuation of Railways (Delaware). Iowa–Illinois does not and did not consist merely of Railways (Delaware) assets. *Mexico Feed,* 980 F.2d at 489. Iowa–Illinois was a previously existing operating company providing utility service in and around the Quad Cities area (Davenport, Iowa; Bettendorf, Iowa;[6] Rock Island, Illinois; East Moline, Illinois; and Moline, Illinois). *Id.* There is no evidence that Railways (Delaware) and Iowa–Illinois shared the same offices, shared the same employees, shared the same supervisory personnel, produced the same products, or shared the same name either before or after the dissolution, and there is no evidence that Iowa–Illinois held itself out to the public as Railways' (Delaware) successor after the dissolution.[7] *Compare Carolina Transformer,*

---

**6.** Though probably not so at the time of the events relevant to this litigation, Bettendorf is now generally considered to be part of the Quad Cities, though the name has not been changed to reflect the fact that five cities are now involved. The Court makes this observation as a matter of historical reference and numerical accuracy and not for any purpose relevant to the legal and factual issues central to this lawsuit.

**7.** Both KCPL and IPC have noted the Iowa–Illinois made representations to the Delaware Chancery Court that arguably constitute holding itself out to the public as a successor. That evidence is addressed separately in a subsequent paragraph.

978 F.2d at 839 (finding of continuity based on same assets, facilities, employees, management, customers, and products); *Bowen Engineering,* 799 F.Supp. at 488 (assumption of all debts and liabilities, contractual designation as successor, same ownership, management, personnel, line of business, principal place of business, facilities, and assets, and held out to public as continuation); *Distler,* 741 F.Supp. at 643 (same employees, management, facilities, product, operating assets, and held out to public as same company); *with Boyd,* 992 F.2d at 408–09 (no finding of continuity); *Mexico Feed,* 980 F.2d at 489 (no finding of continuity); *Asarco,* 909 F.2d at 1266 (no finding continuity). Further, it cannot be said that Iowa–Illinois continued Railways (Delaware) same general business operations because Railways (Delaware) was strictly a holding company with no other "operations." Finally, Iowa–Illinois had no notice of a potential CERCLA claim when it participated in the dissolution of Railways (Delaware). *Compare Mexico Feed,* 980 F.2d at 489; *Asarco,* 909 F.2d at 1265–66; *with Carolina Transformer,* 978 F.2d at 841; *Acushnet River II,* 712 F.Supp. at 1012 & 1019.

IPC and KCPL suggest that Iowa–Illinois did hold itself out as the successor to Railways (Delaware) when Iowa–Illinois described itself to the Delaware Chancery Court as an "equitable stockholder and creditor" of Railways (Delaware). (KCPL Ex. 702, Response No. 47). IPC and KCPL urge reliance on the Delaware court's finding that Iowa–Illinois was the "sole equitable stockholder" of Railways (Delaware). *Id.* (Response No. 48). IPC and KCPL also urge reliance on the fact that Iowa–Illinois was designated as Railways' (Delaware) successor tax agent and was entitled to receive federal income tax refunds attributable to Railways (Delaware). *Id.* (Response Nos. 54 & 58). Finally, IPC and KCPL urge reliance on the cash distributions made to Iowa–Illinois after the dissolution of Railways (Delaware) was complete. *Id.* (Response No. 52). IPC and KCPL contend that Iowa–Illinois should not be allowed to receive the benefits of these representations without also accepting the CERCLA burdens involved in this case.

The Court is not persuaded that this evidence is enough to hold Iowa–Illinois liable as a corporate successor. The Court is not convinced that Iowa–Illinois was holding itself out *to the public as Railways (Delaware) successor.* An application to a court is not the same as issuing a formal announcement of a change of ownership to the public that openly declares the continuation of the former company. *Distler,* 741 F.Supp. at 639. Nor is it the same as contractually preserving the right to use the same name and then doing so. *Acushnet River II,* 712 F.Supp. at 1012 & 1016. Similarly, the Court is persuaded that by that point in time Iowa–Illinois was the only entity known to have a substantial claim against Railways (Delaware) under the plan of dissolution. (IPC Ex. 583, p. 27 para. 18). The terms of the plan had been satisfied as to all of the other operating companies and as to Railways' (Delaware) shareholders. (IPC Ex. 549, para. 7). Iowa–Illinois merely was asserting its rights under the plan of dissolution and no evidence is before this Court which might indicate this assertion was improper. In this Court's opinion, assertion of rights under an SEC-approved plan of dissolution is not the same as a corporation holding itself out to the public as a successor.

The same analysis applies to the tax refund and designation of Iowa–Illinois as Railways' (Delaware) tax agent. It makes sense for the last remaining claimant under the plan of dissolution to take over responsibility for winding up Railways' (Delaware) tax affairs. *Compare Acushnet River II,* 712 F.Supp. at 1018–19. The same is true of the cash distribution made to Iowa–Illinois after the dissolution.

The Court's conclusion is consistent with CERCLA's essential purpose of holding responsible parties liable. *Boyd,* 992 F.2d at 409; *Mexico Feed,* 980 F.2d at 489–90. Iowa–Illinois has no connection to the Mason City site. Both IPC and KCPL are connected to the site and are properly responsible parties. Further, it cannot be said that Railways (Delaware) and Iowa–Illinois conspired to evade their liabilities. *Mexico Feed,* 980 F.2d at 487. Rather, the dissolution of Railways (Delaware) was designed to achieve

compliance with PUHCA. Under the circumstances, the Court would not be justified in imposing CERCLA liability on Iowa–Illinois. *See Carolina Transformer,* 978 F.2d at 837.

### b. Express/Implied Assumption of Liability.

■ KCPL argues that Iowa–Illinois either expressly or impliedly agreed to assume the liabilities of Railways (Delaware). Iowa–Illinois counters that it assumed three specific debts and liabilities of Railways (Delaware), and no others. Furthermore, Iowa–Illinois contends that if the Court finds liability, that liability is limited to the amount of cash received from Railways (Delaware) as per the Assumption Agreement.

The Court is persuaded that Iowa–Illinois did not assume any liabilities from Railways (Delaware) other than the three specific liabilities identified in the Assumption Agreement, which were the liability Railways (Delaware) to certain former employees, the liability of Railways (Delaware), Continental, and Railways Service to W.I. Brown, and the possible liability of Railways (Delaware) to Central Electric & Gas Company. (Iowa–Illinois Ex. 34, pp. 8–10). The evidence relied upon by KCPL supports rather than refutes this conclusion. The mere fact that the Assumption Agreement does not state that Iowa–Illinois did not assume other liabilities cannot not be enough to impose CERCLA liability and KCPL has offered no authority to the contrary.

### c. De Facto Consolidation or Merger.

■ KCPL also asserts that the liquidation of Railways (Delaware) constituted a de facto merger of Railways (Delaware) and Iowa–Illinois. Iowa–Illinois resists this contention. The Court concludes that the dissolution of Railways (Delaware) did not result in a de facto merger or consolidation of Railways (Delaware) and Iowa–Illinois.

■ When a de facto merger is alleged, this Court must determine the reality

of the transaction. *Acushnet River II,* 712 F.Supp. at 1015. "Courts have recognized de facto mergers when:

(1) there is a continuation of the enterprise of the seller in terms of continuity of management, personnel, physical location, assets, and operations;

(2) there is a continuity of shareholders;

(3) the seller ceases operations, liquidates, and dissolves as soon as legally and practically possible; and

(4) the purchasing corporation assumes the obligations of the seller necessary for uninterrupted continuation of business operations."

*Asarco,* 909 F.2d at 1264 (citations omitted). "No one of these factors is either necessary or sufficient to establish a de facto merger." *Acushnet River II,* 712 F.Supp. at 1015. Plainly, the factors relevant to a de facto merger are very similar to the factors the Court considered in relation to the continuation theory. *See Mexico Feed,* 980 F.2d at 488 n. 10.

For largely the same reasons as stated in the discussion of the continuation theory, the Court is similarly persuaded that no de facto merger took place between Railways (Delaware) and Iowa–Illinois. There is no evidence of any continuity of management, personnel, physical location, or general business operations. Any continuity of shareholders is partial at best in that Railways' (Delaware) shareholders also received stock in four other operating companies in addition to Iowa–Illinois stock. (IPC Ex. 583). Iowa–Illinois did not assume all liabilities generally necessary for the uninterrupted continuation of business operations. (Iowa–Illinois Ex. 34, p. 8–10). The Court cannot say that in all reality this transaction was a merger. *Compare Boyd,* 992 F.2d at 408–09; *Asarco,* 909 F.2d at 1264–65; *with Acushnet River II,* 712 F.Supp. at 1015–1019.[8]

---

8. Because the Court finds that Iowa–Illinois is not the corporate successor of Railways (Delaware), the Court has no occasion to consider Iowa–Illinois' alternative defense that the proceedings in the Delaware Chancery Court bar any and all claims IPC and KCPL might assert against Iowa–Illinois in this litigation.

### 2. Piercing Peoples' Corporate Veil.

At first glance, the Court's conclusion that Iowa–Illinois is not liable as the corporate successor of Railways (Delaware) might seem to make further analysis and discussion unnecessary. However, it is a matter akin to the age old question: Which comes first, the chicken or the egg? Just as Iowa–Illinois is not liable if it is not a corporate successor, the corporate successorship question is never reached if People's corporate veil is not pierced. For the sake of clarity and thoroughness in the event of an appeal, the Court addresses the question of whether or not Peoples' (Mason City) corporate veil should be pierced.

In CERCLA cases, courts have used veil piercing terminology to describe two different scenarios whereby a corporate parent is liable even though its subsidiary was the technical owner. First, some courts have used the traditional veil piercing or alter ego tests to decide indirect "owner" liability on corporate parents. *See, e.g., Joslyn Mfg. Co. v. T.L. James & Co.*, 893 F.2d 80, 82–3 (5th Cir.1990); *In re Acushnet River & New Bedford Harbor Proceedings*, 675 F.Supp. 22, 33 (D.Mass.1987) (hereinafter *Acushnet River I* ). Second, other courts have used a control based test to decide direct CERCLA "operator" liability on corporate parents. *See, e.g., United States v. Kayser–Roth Corp., Inc.*, 910 F.2d 24, 27 (1st Cir.1990); *CPC Int'l, Inc. v. Aerojet–General Corp.*, 777 F.Supp. 549, 573 (W.D.Mich.1991). This Court considers both methods for "piercing" Peoples' (Mason City) corporate veil.

### a. Traditional Veil Piercing & Owner Liability.

■■■■ Under traditional veil piercing principles applied in CERCLA cases, courts should consider "(1) inadequate capitalization in light of the purposes for which the corporation was organized, (2) extensive or pervasive control by the shareholder or shareholders, (3) intermingling of the corporation's properties or accounts with those of its owner, (4) failure to observe corporate formalities and separateness, (5) siphoning of funds from the corporation, (6) absence of corporate records, and (7) nonfunctioning officers or directors." *Acushnet River I*, 675 F.Supp. at 33 (citations omitted). "No one of these factors is either necessary or sufficient to disregard corporate separateness. The equitable decision to pierce the veil is dependent on the facts peculiar to each case." *Id.* The factors to be considered in determining alter ego status are different but related, focusing on "substantial identity in terms of corporate ownership, management, business purpose, operation, equipment, customers, and supervision." *Greater Kansas City Laborers Pension Fund v. Thummel*, 738 F.2d 926, 929 (8th Cir.1984); *see also United States v. Mottolo*, 695 F.Supp. 615, 624 (D.N.H.1988) (applying *Thummel* alter ego factors in CERCLA context).

■■■■ The evidence concerning Peoples' (Mason City) technical separateness is conflicting. On the one hand, neither IPC nor KCPL has introduced evidence showing the Peoples was undercapitalized or that there was siphoning of funds between Railways (Maine) and/or Power and Peoples. Likewise, there is no evidence that corporate formalities were not observed or that corporate records were not kept or that Peoples' officers and directors were nonfunctioning. Indeed, the evidence supports a finding the separate records were kept (IPC Ex. 21(b), 21(c), 21(d), 21(e)), that corporate formalities such as board meetings were observed (IPC Ex. 28), and Peoples was not undercapitalized, at least prior to 1932 when KCPL purchased Peoples. (KCPL Ex. 1). On the other hand, IPC and KCPL have argued strenuously that Railways (Maine) totally controlled or at least actively participated in the corporate existence of Peoples'.

■■■■ The common law standards for disregarding the corporate entity are narrow and rigorous, imposing a presumption of corporate separateness. *Mottolo*, 695 F.Supp. at 624; *Wehner v. Syntex Agribusiness, Inc.*, 616 F.Supp. 27, 29 (E.D.Mo.1985). Control alone probably is not sufficient to disregard the corporate separateness of Peoples' and Railways (Maine) and/or Power, in light of the rigor of traditional standards for piercing the corporate veil. Nevertheless, it is evident from the emphasis the parties have placed on the issue of control that the Court

needs to analyze the control factor more fully. Not surprisingly, control and/or active participation have developed as an alternative to the strict traditional veil piercing test for imposing CERCLA liability on parent corporations. *Mobay Corp. v. Allied–Signal, Inc.*, 761 F.Supp. 345, 354 (D.N.J.1991). The Court states no conclusion with regard to traditional veil piercing. Instead, the Court focuses on the control test as set out in the following section.

### b. Control & Operator Liability.

 "CERCLA allows a parent corporation to be held liable as an operator of a subsidiary corporation." *Kayser–Roth*, 910 F.2d at 27. "[A] parent corporation is directly liable under section 107(a)(2) [9] as an operator only when it has exerted power or influence over its subsidiary by actively participating in and exercising control over the subsidiary's business during a period of waste disposal of hazardous waste. A parent's actual participation and control over a subsidiary's functions and decision-making creates 'operator' liability under CERCLA; a parent's mere oversight of a subsidiary's business in a manner appropriate and consistent with the investment relationship between a parent and its wholly owned subsidiary does not." *CPC Int'l*, 777 F.Supp. at 573. "Factors to consider ... include the parent's participation in the subsidiary's board of directors, management, day-to-day operations, and specific policy matters, including areas such as manufacturing, finances, personnel and waste disposal. In addition, determining the origin and business function of the subsidiary in the context of the parent corporation's business may be helpful.... Other evidence may be less probative if it is simply indicative of the actions of a prudent investor, rather than an active operator, including monitoring of a subsidiary's financial performance, consolidation of corporate business matters such as accounting and legal work, and cooperation between the subsidiary and the parent in research.

In the final analysis, each case be decided on its own unique facts and circumstances." *Id.* Of course, "the policies embodied in the statute should direct the veil piercing inquiry." *Acushnet River I*, 675 F.Supp. at 33.

IPC and KCPL have introduced evidence suggesting that Railways (Maine) and/or Power controlled Peoples. It is undisputed that after 1913, Railways (Maine), and then Power,[10] owned Peoples as a wholly owned subsidiary. The record contains evidence that Peoples and Power shared at least two officers. (IPC Ex. 539, IPC Ex. 540, KCPL Ex. 2). There also is evidence in the record that the property of Peoples was subjected to the mortgages of Power. (IPC Ex. 20). This evidence begins to lay the groundwork for a conclusion of control.

Furthermore, there is evidence in the record that Peoples and Railways (Maine) executed a series of contracts appointing Railways (Maine) as General Manager for Peoples and granting Railways (Maine) substantial contractual rights to manage, supervise, and control the affairs of Peoples. (IPC Ex. 13). Railways (Maine) was given the power to "supervise, control, manage and finance the operations;" the power to "superintend and direct the keeping of all books and accounts;" the power to insert its own officers as officers of Peoples; and the power to hire and fire personnel. *Id.* This control was complete, pervasive, and without any apparent limitation, granting Railways (Maine) "the entire supervision, control and management of all of the properties and books" of Peoples. *Id.* There is no evidence in the record suggesting that Railways (Maine) did not exercise these rights.

Iowa–Illinois contends that this evidence shows nothing more than the kind of control typically associated with a parent-subsidiary relationship. In other words, the oversight exercised by Railways (Maine) and Power was "appropriate and consistent with the investment relationship between a parent and its wholly owned subsidiary." *CPC Int'l*, 777

---

**9.** 42 U.S.C. § 9607(a)(2).

**10.** Counsel for Iowa–Illinois suggested in opening statement that Power did not assume Railways' (Maine) environmental liability as a result

of the 1923 acquisition. This line of argument was not pursued in Iowa–Illinois' own Proposed Findings of Fact and Conclusions of Law, and not challenged when asserted by IPC or KCPL.

F.Supp. at 573. According to Iowa–Illinois, this level of control is not enough to warrant disregarding Peoples' separate corporate existence to impose liability on Railways (Maine) and Power.

The Court is persuaded that Peoples' separate corporate existence should be disregarded. *Kayser–Roth,* 910 F.2d at 27–28; *CPC Int'l,* 777 F.Supp. at 574–75. Based upon their complete ownership of Peoples, their control over Peoples' assets such that the assets could be subjected to a mortgage, their shared officers, and their complete domination and control of Peoples, as memorialized by the management contracts, the Court finds that Railways (Maine) and Power would be liable as operators of the Mason City site from some time in 1912 or 1913, until the site was sold to KCPL in 1932. *Id.* As previously mentioned, this conclusion merely allows the Court to go on and consider Iowa–Illinois' successor status and does not require any particular result.

### 3. KCPL's Status As Corporate Successor Or Operator.

A few issues remain that can be grouped loosely under the heading of KCPL's status as a corporate successor to Peoples and/or KCPL's status as an operator under the principles in the previous section. KCPL does not dispute that it is a responsible party. Rather, KCPL asserts that Power indemnified KCPL for any liabilities that might arise from its purchase and operation of Peoples.

 The Court finds that Power did not indemnify KCPL for CERCLA liability. There is no evidence that the parties contemplated environmental liability. Nor is the language of the agreement so all-encompassing that the Court can conclude Power intended to absolve KCPL of all responsibility for the site. (IPC Ex. 47). For the same reasons as stated in the Court's discussion of the indemnity agreement(s) between IPC and KCPL, the indemnity agreement between KCPL and Power does not satisfy the standards set out previously in this order. *See supra,* pp. 1264–1265 & 1268–1271, and cases cited therein.

Likewise, the Court would find that KCPL did not assume from Peoples the CERCLA liabilities at issue in this litigation. Such a finding is practically meaningless, however, because the evidence overwhelmingly supports a finding that KCPL is liable on a continuation theory, a de facto merger theory, or the control test for disregarding Peoples' separate corporate existence and KCPL repeatedly has conceded its liability in this case.

Furthermore, KCPL's indemnification argument in relation to Power is only a partial defense as the agreement does not cover hazardous wastes generated and disposed of after KCPL's ownership of the Mason City site. KCPL does not dispute that coal tars were generated and disposed after it took over the Mason City site. Under CERCLA's rule of joint and several liability, *Kayser–Roth,* 910 F.2d at 26, KCPL is still liable for costs incurred from coal tars generated and disposed after it took over Peoples.

Finally, these conclusions are important only for completeness purposes. The Court's conclusion that Iowa–Illinois is not the successor of Railways (Maine) means that KCPL does not escape liability no matter what the Court concludes in this regard.

In sum, the Court concludes that Iowa–Illinois is not the corporate successor to Railways (Delaware) under the plan of dissolution to achieve compliance with PUHCA; that it is appropriate to reach the question of successorship because both Railways (Maine) and Power pervasively controlled Peoples (Mason City); and that Power did not indemnify KCPL for CERCLA liability, cutting off KCPL's additional theory of successor liability.

### CONCLUSION

The bottom line in this case is that in 1957, nobody concerned themselves with potential liability for coal tar that resulted from the production of manufactured gas. For this reason, the coal tars buried at the Mason City site were never a subject of negotiation between IPC and KCPL or between Power and KCPL. As such, the Court has concluded that KCPL is not indemnified for liability

arising out of the clean-up of the Mason City site.

As for Iowa–Illinois, the principles behind CERCLA must be weighed against the principles behind PUHCA. It would be ironic for a congressionally mandated breakup of the utility holding company system to result in CERCLA liability years later for all of the operating companies that ended up receiving assets from holding companies. The Court has concluded that such a result should not be reached in this case and Iowa–Illinois should not be held liable as the corporate successor of Railways (Delaware).

### ORDER

1. The Court finds in favor of IPC and against KCPL on Counts I, II, and VIII of the Complaint—IPC's CERCLA claims against KCPL.

2. The Court finds against IPC and in favor of KCPL on Counts IV and V of the Complaint—IPC's state law claims for indemnification and contribution for abatement of a public nuisance. IPC's nuisance claims shall be dismissed and judgment entered accordingly.

3. The Court finds against IPC and in favor of KCPL on Count VI of the Complaint—IPC's state law claim for indemnification for failure to disclose a dangerous condition. IPC's indemnification claim shall be dismissed and judgment entered accordingly.

4. The Court finds in favor of IPC and against KCPL on Count VII of the Complaint—IPC's state law claim for contribution. Having construed Count VII as a request for declaratory relief, the Court declares that at such time as the costs for investigation and remediation of the Mason City site become fixed, KCPL shall be liable to IPC.

5. The Court finds against IPC and in favor of Iowa–Illinois on Counts XI, XII, and XIII (all counts). IPC's claims against Iowa–Illinois are dismissed and judgment shall be entered accordingly.

6. The Court finds against KCPL and in favor of IPC on KCPL's counterclaim for declaratory judgment.

7. The Court finds against KCPL and in favor of Iowa–Illinois on Counts I, II, III, and IV of KCPL's third-party Complaint. KCPL's claims against Iowa–Illinois are dismissed and judgment shall be entered accordingly.

8. This matter shall be set for trial to the Court on the question of damages on IPC's claims against KCPL.

IT IS SO ORDERED.

## APPENDIX A

## Theories of Successorship